1  AARON D. LOVAAS (State Bar No. 5701)
   aaron@lovaas-lehtinen.com
2  KRISTAN E. LEHTINEN (State Bar No. 8155)
   kristan@globalbusinesslawyersusa.com
3  LOVAAS & LEHTINEN, P.C.
   6128 West Sahara Avenue
4  Las Vegas, Nevada 89146
   Telephone: (702) 388-1011
5  Facsimile: (702) 387-1011

6  BENJAMIN F. EASTERLIN IV *(pro hac vice* pending*)*
   beasterlin@kslaw.com
7  KING & SPALDING LLP
   1180 Peachtree Street N.E.
8  Atlanta, Georgia 30309
   Telephone: (404) 572-4600
9  Facsimile: (404) 572-5100

10

11 Attorneys for Plaintiffs
   MARY ANN BLANCO, ET AL
12

13                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
14

15

16 **MARY ANN BLANCO, ET AL,**

17          **Plaintiffs,**                      CASE NO.

18            **vs.**

19 **TRUMP RUFFIN TOWER I, LLC**

20          **Defendant.**                       **PLAINTIFFS' MOTION TO VACATE
                                                 ARBITRATION AWARD AND
21                                               MEMORANDUM OF POINTS AND
                                                 AUTHORITIES**
22

23

24

25

26

27

28

1    Pursuant to 9 U.S.C. §§ 6 and 10, Rule 7(b)(1) of the Federal Rules of Civil Procedure, and

2    Local Rule 7-2 *et seq.*, Plaintiffs Mary Ann Blanco et al. ("Plaintiffs"), by their attorneys, respectfully

3    move this Court to vacate the Arbitrator's Order, Findings, and Conclusions on Claimants' Causes of

4    Action Seeking to Enforce Rescission Pursuant to 15 U.S.C. § 1703(d) ("Award") (Ex. 2), rendered in

5    the pending arbitration proceedings styled *Mary Ann Blanco et al. adv. Trump Ruffin Tower I LLC,*

6    AAA File No. 79 115 Y 00125 08 JISI, on the grounds that the Arbitrator exceeded the scope of his

7

8    authority by rendering an Award that manifestly disregarded applicable law and was irrational.

9    **LOCAL RULE 8-1 STATEMENT OF JURISDICTION**

10   This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Movants' principal allegation is that

11   the Arbitrator rendered his final Award in manifest disregard of 15 U.S.C. § 1703(d)(2), a federal

12   statute. As the Ninth Circuit has held,

13   review for manifest disregard of federal law necessarily requires the reviewing court to
     do two things: first, determine what the federal law is, and second, determine whether
14   the arbitrator's decision manifestly disregarded that law. This process so immerses the
     federal court in questions of federal law and their proper application that federal
15   question subject matter jurisdiction is present.

16   *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004) (quoting *Greenburg v. Bear,*

17   *Stearns & Co.*, 220 F.3d 22, 27 (2d Cir. 2000)).

18

19   **INTRODUCTION**

20   This should have been an easy case, as it begins and ends with the straightforward application

21   of the plain language of 15 U.S.C. § 1703(d). That statute unambiguously provides purchasers of

22   property governed by the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. § 1701 *et seq.*,

23   with an automatic, unconditional two-year right to revoke a purchase agreement that fails to contain

24   certain specified disclosures and protections. Plaintiffs signed materially identical purchase agreements

25   subject to § 1703(d) with Trump Ruffin Tower I, LLC ("Trump") for units in Trump Hotel & Tower

26   — Las Vegas ("Agreements"). Those Agreements failed to include the disclosures and protections set

27

28

2

1  forth in § 1703(d)(2). Accordingly, every purchaser had a statutory right to revoke their Agreement

2  within two years of signing. Because that is the "only conclusion which the facts of this case can

3  support," this Court cannot "accord judicial deference to any other conclusion by the arbitrator." *Am.*

4  *Postal Workers Union AFL-CIO v. U.S. Postal Serv.*, 682 F.2d 1280, 1285 (9th Cir. 1982). Confirming

5  the Award would impermissibly "empower the arbitrator to nullify the mandates of Congress" based

6

7  on his own policy preferences. *Id.*

8                                      **BACKGROUND**

9       **A.      Statutory Background**

10          Congress enacted ILSA to protect purchasers from "abuse by real estate developers ... in the

11  promotion and sale of properties offered as part of a common promotional plan." *Old Coach Dev.*

12  *Corp., Inc. v. Tanzman*, 692 F. Supp. 424, 426 (D.N.J. 1988); *see also Flint Ridge Dev. Co. v. Scenic*

13  *Rivers Ass'n of Okla.*, 426 U.S. 776, 778 (1976). Common abuses targeted by Congress include

14  nondisclosure and fraud, as well as unscrupulous contracting practices such as inclusion of provisions

15  that permit a seller to revoke a contract and retain all prior payments in the event of purchaser default.

16
    *See* H.R. Rep. No. 96-154 at 37 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2353. Congress noted
17
    that these abuses are more likely when a seller pressures a purchaser to make a hurried decision, thus
18
19  depriving the purchaser of the opportunity to consider all pertinent information. *See id.* at 2352.

20          To curb these and other common abuses, ILSA provides purchasers with an automatic,

21  unconditional right to revoke a contract under certain circumstances. As relevant here, § 1703(d) sets

22  forth certain disclosures and protections to be included in a contract regarding the nature of the property

23  and the purchaser's rights in the event of default. If the "contract" does not include those disclosures

24  and protections, it "may be revoked at the option of the purchaser" within two years of the date of

25  signing. 15 U.S.C. § 1703(d). A purchaser that revokes a contract under any of the provisions of

26
    § 1703(d) is entitled to a refund of all money paid under the contract. *See id.* § 1703(e).
27
                                            3
28

The specific provision at issue in this case is § 1703(d)(2), which reads, in relevant part:

(d) [a]ny contract or agreement which is for the sale or lease of a lot not exempt under section 1702 of this title and which does not provide--

*   *   *

(2) that, in the event of a default or breach of the contract or agreement by the purchaser or lessee, the seller or lessor (or successor thereof) will provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date of the receipt of such notice;

*   *   *

may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement.

By its plain language, § 1703(d)(2) does not invalidate a contract governed by ILSA that fails to include such a "notice-and-cure" provision. "The seller instead is given an incentive: should the seller choose to exclude it [from the contract], the buyer is permitted to revoke the purchase contract for up to two years after its signing." *Pugliese v. Pukka Dev., Inc.*, 524 F. Supp. 2d 1370, 1372 (S.D. Fla. 2007), *rev'd and remanded on other grounds*, 550 F.3d 1299 (11th Cir. 2008).

## B.    Factual Background

Plaintiffs purchased their units in 2005-2006 when the real estate market was booming. Trump took full advantage of that boom and aggressively spread the message that units were in short supply and rapidly rising in price. *See, e.g.*, *Trump Breaks Ground on Vegas Hotel*, ASSOCIATED PRESS, July 12, 2005 ("Trump said condos, priced from $600,000 to $6 million, sold out within a week.") (Ex. 3); *John Katsilometes Talks To The Donald About the Rush of Buyers For His Condos*, LAS VEGAS SUN, May 5, 2006, at A3 (reporting Trump's claims that "fewer than 100 of the more than 1,200 units are left for sale" and that there was "a late rush of buyers over the weekend" after Trump announced "that the purchase price would be raised by 15 percent on Monday") (Ex. 4). Trump used that message to manufacture a purchasing frenzy in which potential purchasers believed they were in a now-or-never

4

1  situation. *See Final Residences Available At Trump International Hotel & Tower Las Vegas*, LAS

2  VEGAS REV. J., Mar. 24, 2007 ("There are only a handful of units available in the building, so time is of

3  the essence for interested buyers.") (Ex. 5).  Trump also claimed that, due to the purported success of

4  Trump Tower, it would construct a second Trump Tower in Las Vegas that would elevate the value of

5  units in the first building.  *See Living the High Life, Trump Style: Developer Breaks Ground On First*

6
   *Las Vegas Venture*, LAS VEGAS REV. J., July 13, 2005, at 1D (Ex. 6).
7

8          None of these reports was true.  Trump's repeated claim that units were rapidly selling out was

9  based on nothing more than non-binding reservation forms signed by prospective purchasers.  *See*

10 Eckel Dep. 25:17-26:24 (testifying that Trump's own sales staff "snickered" at "Mr. Trump's

11 statements that [Trump] had *sold* 'X' when, in fact, [Trump] had *reserved* 'X'") (emphasis added) (Ex.

12 7).  Even several years later, not all of the units had been sold. Christie Dep. 98:2-6, 101:3-8, 104:8-10

13 (Ex. 8); D. Trump Dep. 93:6-95:1 (Ex. 9).  Nor was there any increase in the value of the units; instead,

14 Trump simply manipulated market perceptions.  *See* Eckel Dep. 29:17-30:14 (claiming that units had

15 appreciated in value, even though no unit had been re-sold for a higher price, because Trump was

16
   unilaterally increasing prices for new units) (Ex. 7).  And to date, Trump has not begun construction of
17

18 Trump Tower II, and has no definitive plans to do so.  *See* D. Trump Dep. 116:24-117:13 (Ex. 9).

19 These are precisely the kinds of unscrupulous practices, designed to manipulate potential purchasers

20 into making uninformed purchases, that ILSA is intended to prevent.  *See, e.g.*, 24 C.F.R. § 1715.20(h)

21 (prohibiting unsubstantiated claims of investment potential or value).

22          By the time Trump's misrepresentations came to light, the damage was already done.

23 Believing they had a very limited window of opportunity, purchasers acquiesced when Trump

24 presented them with a non-negotiable, one-sided purchase Agreement that forced them to forego their

25 right to a jury trial in favor of arbitration.  *See* D. Trump Dep. 85:6-16 (admitting the Agreement was

26
   "one-sided" and presented on a take-it-or-leave-it basis) (Ex. 9).  In addition to including material
27
                                                      5
28

1   misrepresentations about the units -- which were smaller and closer to the ground in a building with

2   eight fewer floors than purchasers had been led to believe -- the Agreement did not provide purchasers

3   with a right to notice and cure in the event of a default, as set forth in 15 U.S.C. § 1703(d)(2).  Quite the

4   contrary, the Agreement expressly granted Trump "*the option of terminating this Agreement without

5   prior notice*" if a "Buyer fails to timely pay a deposit or close on the Closing Date."  Agreement

6
7   ¶ 17.1/18.1 (emphasis added) (Ex. 10).  The same paragraph adds:  "*[W]ith the exception of Buyer's

8   failure to timely pay a deposit or close on the Closing Date,* Seller shall give Buyer written notice of

9   Buyer's default or breach of this agreement and give Buyer the opportunity to correct the default or

10  breach within twenty (20) days from receipt of such notice." *Id.* (emphasis added).  By expressly

11  excepting those circumstances from the buyer's notice-and-cure right, the Agreement contained exactly

12  what ILSA aimed to prevent: a provision entitling the seller, in the event of a purchaser default, to both

13  keep the purchaser's deposit without providing the purchaser an opportunity to cure the default *and*

14  resell the unit for more money to another purchaser.

15          The Agreement also contained a "savings clause" that purported to eliminate a purchaser's

16  revocation rights.  That clause reads, in relevant part:

17
18      [I]f the mere inclusion in this Agreement of language granting to Seller certain rights,
        remedies and powers, or waiving or limiting any of Buyer's rights, remedies or powers,
19      or Seller's obligations, results in a final determination ... that Buyer has the right to
        cancel this Agreement and receive a refund of Buyer's deposit, such offending rights,
20      powers, limitations and/or waivers shall be struck, cancelled and rendered
        unenforceable, ineffective and null and void.  Under no circumstances shall either
21      Buyer or Seller have the right to cancel this Agreement solely by reason of the
        inclusion of certain language in this Agreement, unless the specific purpose of that
22      language is to grant a right of cancellation.

23  Agreement ¶ 24.6/25.6 (Ex. 10).  Under Trump's view of the savings clause, Trump has the best of

24  both worlds: upon a default, it can rely on the Agreement's exceptions to the notice-and-cure right to

25  revoke the Agreement without notice and an opportunity to cure and keep the deposit, yet it can also

26  disclaim those exceptions if a purchaser manages to discover his right to revoke under § 1703(d)(2).

27                                         6

28

Trump's witnesses admitted that Trump knew of ILSA's requirements (Day 3 Hearing Tr. 500:17-501:6 (Ex. 13); Hulse Dep. 21:17-21, 136:13 (Ex. 17); Day 2 Hearing Tr. 393:15-17 (Ex. 12)), but knowingly included the exceptions to the notice-and-cure provisions of §1703(d)(2) in the Agreement anyway (Day 3 Hearing Tr. 395:22-396:8 (Ex. 13); Day 4 Hearing Tr. 506:14-21; 542:1-8; 543:17-23 (Ex. 14)).  Trump was aware at least as early as November 2005 that the exceptions in the Agreement rendered the notice-and-cure provision noncompliant with § 1703(d)(2). Day 2 Hearing Tr. 372:14-20, 373:5-9 (Ex. 12); Day 3 Hearing Tr. 513:9-23 (Ex. 13).  Trump's witnesses admitted that Trump deliberately chose not to amend existing Agreements or to remove the exceptions from the Agreement form upon learning of this deficiency. Byrne Dep. 27:14-20 (Ex. 18); Day 2 Hearing Tr. 316:25-317:7 (Ex. 12). Instead, Trump intentionally used the very same deficient Agreement to sell units to subsequent purchasers, with the apparent assumption that Trump could invoke the savings clause to belatedly "eliminate" the exceptions to the notice-and-cure right if any purchaser sought to revoke. Byrne Dep. 26:22-27:10 (Ex. 18); Day 2 Hearing Tr. 377:14-17 (Ex. 12). In an attempt to preempt any revocation claims, Trump also -- again, without notifying purchasers of the deficiency in the Agreement -- began sending letters to purchasers who defaulted by failing to timely pay a deposit that came due a year after signing their Agreements. Those letters provided notice of the default and belatedly offered an opportunity to cure, contrary to the provisions in the Agreement itself. Day 2 Hearing Tr. 337:24-339:3 (Ex. 12); Day 3 Hearing Tr. 664:10-665:12 (Ex. 13).

In October 2006, a purchaser discovered Trump's noncompliance with § 1703(d)(2) and demanded return of his deposits in accordance with § 1703(d)(2). Day 3 Hearing Tr. 589:12-18 (Ex. 13). In response, Trump's attorneys provided Trump with the following advice:

> [W]e recommend that Trump not take any affirmative action at this time with regard to other purchase agreements for units in [Trump Tower] that contain the same inadvertent exception to the 20-day notice and cure period.  While Trump could send out a letter to each of these purchasers attempting to amend the purchase agreement to give a 20 day notice and cure for all defaults, such a letter will likely only raise an

7

argument for rescission for other purchasers looking for a way out of their contracts. On the other hand, if Trump refunds [this purchaser's] money, requires [this purchaser] to enter a confidentiality agreement, and does not send out a letter to other purchasers, then it is likely that purchasers will never become aware of this argument. Once two years from the date the purchasers sign those agreements is lapsed, any right to rescission under [§ 1703(d)] for these purchasers will expire.

Day 2 Hearing Tr. 458:25–459:9 (Ex. 12). Trump followed that advice, and entered into a confidential refund agreement with this single purchaser. Day 2 Hearing Tr. 460:9-14 (Ex. 12); Day 3 Hearing Tr. 573:15–574:12 (Ex. 13). Even after that settlement, Trump continued to sell units using the same deficient Agreement. Day 2 Hearing Tr. 317:1-7, 377:14-19 (Ex. 12).

## C.    The Arbitrator's Award

On March 12, 2010, the Arbitrator conducted a hearing pursuant to the Supplemental Stipulation Regarding Bifurcated Arbitration Hearings (the "Stipulation") under which the parties agreed to determine the "threshold issue of whether Trump actually or substantially complied with the terms of 15 U.S.C. § 1703(d)(2) . . . and whether any such alleged non-compliance triggers a right to revoke the sales contracts to purchase units in Trump Tower - Las Vegas ... (the "Threshold Issue")." Stipulation 1 (Ex. 19). The parties agreed that the Threshold Issue "is a legal issue to be decided by the Arbitrator" and that "[i]n the event the Arbitrator decides the Threshold Issue in Claimants' favor as to some or all of the Agreements, that ruling shall be *final* as to such Agreements." *Id.* (emphasis added).

Following the March 12, 2010 hearing, the Arbitrator *granted* Plaintiffs' Motion for Enforcement of a Two-Year Right of Rescission pursuant to 15 U.S.C. § 1703(d)(2) and ruled that Claimants could "proceed with their presentation of a two-year right of rescission under the statute, it being demonstrated to the satisfaction of the Arbitrator that Respondent did not fully comply with said statute." April 12, 2010 Ruling 2 ("April Ruling") (Ex. 20). Specifically, the Arbitrator found "the statutory language [of § 1703(d)(2)] to be *unambiguous* in requiring that [Trump] in fact provide Claimants with notice of their 'notice, cure and revocation rights' *in the respective purchase*

8

1  *agreements*, without qualification." *Id.* (emphasis in original).  The Arbitrator further stated that

2  "construing the statute in accordance with the 'Plain Meaning Rule' . . . , the Arbitrator finds that the

3  statutory terms are sufficiently clear and unambiguous such that resort to a detailed review of the

4  legislative history avails little on the point." *Id.*  However, the Arbitrator abrogated his responsibility

5  under the Stipulation to rule on the substantial compliance issue.  Despite admitting that "the parties

6
7  submitted extensive briefing on the issue of whether a demonstration of substantial compliance is

8  sufficient to comply with the statute," the Arbitrator claimed inability to decide this strictly legal issue.

9  *Id.*  In so doing, the Arbitrator failed to carry out his obligation to resolve legal issues presented to him

10  and to rule pursuant to the terms of the agreement between the parties as set forth in the Stipulation.

11  This unwillingness to apply the law was consistent with and a harbinger of the Arbitrator's ultimate

12  decision to disregard the law and fashion a ruling based on his own policy opinions.

13  As provided by the Stipulation, the Arbitrator subsequently held an evidentiary hearing

14  beginning July 14, 2010 to decide the remaining issue of whether Plaintiffs were entitled to exercise the

15  revocation right triggered by Trump's failure to comply with § 1703(d)(2) in light of a savings clause in

16
17  the Agreement.  Under Rule 46 of the American Arbitration Association Commercial Arbitration Rules

18  and the doctrine of *functus officio* adopted in this Circuit, the Arbitrator had no authority to revisit in

19  this hearing his earlier decisions contained in the April Ruling.  *Bosack v. Soward*, 586 F.3d 1096, 1103

20  (9th Cir. 2009) ((citing *McClatchy Newspapers v. Cent.l Valley Typographical Union No. 46*, 686 F.2d

21  731, 734 n.1 (9th Cir. 1982) (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 573 (3d

22  Cir. 1967)) ("Rule 46 provides that '[t]he arbitrator is not empowered to redetermine the merits of any

23  claim already decided.'  This rule essentially codifies the common law doctrine of *functus officio*,

24  which 'forbids an arbitrator to redetermine an issue which he has already decided.'").

25  Yet on November 1, 2010, the Arbitrator issued the Award dismissing Plaintiffs' § 1703(d)(2)

26  claims.  In the Award, the Arbitrator made no mention of his prior rulings in favor of Plaintiffs.  The

27
28

9

April Ruling on the Threshold Issue of "whether [Trump's] non-compliance triggers a right to revoke the sales contract" (Stipulation 1 (Ex. 19)), held that in the absence of a ruling on Trump's substantial compliance and savings clause defenses, Plaintiffs "may proceed with their presentation of a two-year right of rescission under the statute." April Ruling 3 (Ex. 20). But in the Award, the Arbitrator *contradicted* the April Ruling by adding a new element to the threshold issue of whether Trump's non-compliance triggered the revocation right. Specifically, the Arbitrator "conclude[d] that the issue of whether a purchaser in fact receives the protections contemplated by ILSA is critical in determining whether ILSA was violated." Award 11 (Ex. 2). The Arbitrator also based his conclusion that Trump substantially complied with the statute on a finding that Plaintiffs "were not damaged in any way by the limitations in the Agreements on their § 1703(d)(2) notice and cure rights." *Id.* 19. This creation of a "harm" element as a precondition to exercise of the revocation right not only disregards the law (*see* Section A below), it violates Rule 46 and the common-law principle of *functus officio.*

The Arbitrator made no mention of the text of the statute, which, as he previously acknowledged, requires a seller to disclose a notice-and-cure right *in the contract* if it wishes to eliminate the two-year revocation right that would otherwise apply. Instead, he rejected the Plain Meaning Rule he applied in the April Ruling and relied heavily on his interpretation of legislative history, in contradiction to his April Ruling that such history was irrelevant, to manufacture and read into the statute a non-existent requirement that purchasers must incur harm from a seller's non-compliance with the statute as a pre-condition to exercising their statutory revocation remedy. *Id.* 8-11. Having decided the "Threshold Issue" in his April Ruling that Trump violated § 1703(d)(2), the Arbitrator exceeded the scope of his authority by issuing the subsequent November 1, 2010 Ruling that § 1703(d)(2) was not violated because Claimants failed to demonstrate harm. *Id.* 11.

The Arbitrator also found that the savings clause "is valid, enforceable, and cured any inadvertent defects in [Trump's] compliance with ILSA." *Id.* 13. In so ruling, the Arbitrator ignored

the indisputable fact that the specific terms of the savings clause do not operate to cure (and cannot even be applied to seek to cure) the Agreement's noncompliance with the statute. Moreover, the Arbitrator declined to follow the ILSA cases provided by Plaintiffs that expressly hold savings clauses unenforceable under similar circumstances. Instead, he inaccurately claimed that "most cases decided since [those cases] have not found savings clauses unenforceable." *Id.* 16. The Arbitrator also irrationally found that because Trump complied with ILSA's requirement to register the development with the Department of Housing and Urban Development ("HUD"), the savings clause "must be applied to preserve that compliance" by curing Trump's noncompliance with *other* provisions of ILSA, namely § 1703(d)(2). *Id.* 16-17. In fact, the Arbitrator should not have considered the efficacy of the savings clause because there was no "final determination" that Plaintiffs had a right to revoke, which is required by the Agreement before the savings clause can be applied. Agreement ¶ 25.6 (Ex. 10).

Finally, the Arbitrator concluded that Trump "substantially complied with ILSA." *Id.* 18-19. The Arbitrator acknowledged that the "preeminent objective" of ILSA is to provide purchasers with certain disclosures. Nonetheless, the Arbitrator concluded, without authority, that Trump's noncompliance with the mandate of § 1703(d)(2) could be excused because Trump provided purchasers with a property report (containing terms contradicting the Agreement), which provided actual notice and an opportunity to cure and because Trump complied with other provisions of ILSA.

## LEGAL STANDARD

Arbitrators have broad authority, but that authority "is not unlimited." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006); *see also Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996) ("[C]ourts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators."). "[W]here the arbitrators exceeded their powers," a district court may vacate an arbitration award. 9 U.S.C. § 10(a)(4). An arbitrator exceeds his powers by rendering an award that manifestly disregards the law or is completely irrational. *See Comedy Club,*

11

1   *Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009).  An arbitrator manifestly disregards the

2   law when "the arbitrator recognize[s] the applicable law and then ignore[s] it."  *Id.* (internal quotation

3   and alterations omitted).  An arbitration award is completely irrational when it "fails to draw its essence

4   from the [parties'] agreement."  *Id.* at 1288; *see also Coast Trading Co. v. Pac. Molasses Co.*, 681 F.2d

5   1195, 1197 (9th Cir. 1982) (because "an arbitrator ' … does not sit to dispense his own brand of

6   industrial justice …. [an] award is legitimate only so long as it draws its essence from the …

7   agreement'") (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597, 80

8

9   S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

10      As the Supreme Court recently reiterated, "the task of an arbitrator is to interpret and enforce a

11   contract, not to make public policy."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758,

12   1767 (2010).  When "[t]he conclusion is inescapable that the [arbitration] panel simply imposed its own

13   conception of sound policy," instead of relying on the law and the contract, "an arbitration decision

14   may be vacated … on the ground that the arbitrator 'exceeded [his] powers.'"  *Id.* at 1769, 1767

15   (quoting 9 U.S.C. § 10(a)(4)); *see also Patten*, 441 F.3d at 235 (vacating award that was based on

16   arbitrator's "own personal notions of right and wrong").

17

18      *American Postal Workers* is particularly instructive.  There, the arbitrator ordered reinstatement

19   of a postal worker who participated in a strike against the federal government, even though a federal

20   statute unambiguously prohibited such individuals from holding government positions.  682 F.2d at

21   1283.  The arbitrator "concluded that the penalty of discharge was too severe a sanction because [the

22   employee] was young, misinformed, and potentially valuable as an employee."  *Id.* at 1285.  The Ninth

23   Circuit reversed, explaining that because "[t]he choice of sanctions … has already been made by

24   Congress," affirming the reinstatement award would "empower the arbitrator to nullify the mandates of

25   Congress," which a court may not do.  *Id.*

26

27

## ARGUMENT AND CITATION OF AUTHORITY

12

28

1    The Arbitrator vastly exceeded the bounds of his authority in this case. First, the Arbitrator

2    manifestly disregarded the unambiguous text of § 1703(d)(2), as well as the holdings of all applicable

3    cases -- including the very cases upon which he purported to rely -- to manufacture a requirement that

4    Plaintiffs demonstrate some specific injury stemming from Trump's failure to comply with the statute.

5    Second, the Arbitrator invoked the Agreement's general savings clause to permit Trump to

6    retroactively "cure" its noncompliance with § 1703(d)(2)'s disclosure requirement, even though (1) the

7    savings clause by its own terms does not operate to cure Trump's noncompliance with the statute and

8    (2) courts have routinely concluded that it violates public policy to use a general savings clause to cure

9    a contractual provision that patently failed to comply with an unambiguous statutory requirement

10   (especially an unambiguous disclosure requirement, as a general savings clause can hardly make up for

11   the lack of a specific disclosure). Finally, the Arbitrator reached the irrational conclusion that Trump

12   "substantially complied" with § 1703(d)(2) by complying with *other* provisions of ILSA.

13       Rooted in neither the statute nor the Agreement, those findings reflect no more than the

14   Arbitrator's "own personal notions of right and wrong." *Patten*, 441 F.3d at 235. The Arbitrator's

15   discussion of certain legal authorities only confirms that conclusion, as he ignored the plain statutory

16   text and mischaracterized other important legal authorities. Because such manifest

17   mischaracterizations of the law amount to and evidence manifest disregard of the law, this Court has

18   "no choice but to refuse enforcement of the award." *Int'l Union*, *United Mine Workers of Am. V.*

19   *Marrowbone Dev. Co.*, 232 F.3d 383, 389 (4th Cir. 2000); 9 U.S.C. § 10(a).

20   **A.    The Arbitrator's Conclusion that § 1703(d)(2) Requires a Showing of Specific
             Harm Manifestly Disregards the Text of the Statute and Case Law.**

21       The Arbitration Award addresses a single question: whether Plaintiffs have a right to revoke

22   their Agreements under 15 U.S.C. § 1703(d)(2). It should go without saying that this question cannot

23   be answered without at the very least examining the text of § 1703(d)(2). *See Norfolk & W. Ry. Co. v.*

13

*Am. Train Dispatcher's Ass'n*, 499 U.S. 117, 128 (1991) ("As always, we begin with the language of the statute and ask whether Congress has spoken on the subject before us."). Yet not once did the Arbitrator set forth, quote from, or even purport to interpret any of the language of the statute. "Where an arbitration panel cites relevant law, then proceeds to ignore it, it is said to evidence a manifest disregard for the law." *Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC*, 319 F.3d 1060, 1069 (8th Cir. 2003). That is precisely what happened here.

The statutory language is straightforward: any contract subject to ILSA that does not "provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date of the receipt of such notice," may be revoked at the purchaser's option for two years from the date of signing the contract. 15 U.S.C. § 1703(d)(2). The meaning is unambiguous: Unless a *contract* creates and discloses a right to notice of and an opportunity to cure any default, "the buyer is permitted to revoke the purchase contract for up to two years after its signing." *Pugliese*, 524 F. Supp. 2d at 1372.

Section 1703(d)(2) thus establishes "an *automatic, unconditional* right to revoke" within two years any contract that fails to include its protections. *Plant v. Merrifield Town Ctr. Ltd. P'ship*, Nos. 1:08cv374, 1:08cv566, 2009 WL 2225415, at *3, n.6 (E.D. Va. July 21, 2009) (emphasis in original); Appx, A[1] (Ex. 1). The statute requires no showing beyond the simple fact that the contract does not include its protections. To read injury, intent, or any other requirement into the statute would not only add a requirement to the statute that it clearly does not contain, it would also contravene courts' repeated admonitions that ILSA's provisions be read "broadly to effectuate" Congress's goal of

---

[1] The appendix provides citations to instances where Plaintiffs advised the Arbitrator of a well-established point of law in briefs, hearings, and presentations and demonstrates that the Arbitrator was well-aware of these authorities, but simply chose to ignore them.

14

1  "protect[ing] purchasers." *Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir. 1991). Courts have

2  consistently concluded that requiring a purchaser to demonstrate specific injury before revoking a

3  purchase contract under any of § 1703's provisions would contravene both the text of the statute and

4  congressional intent. *See, e.g., Schatz v. Jockey Club Phase III, Ltd.*, 604 F. Supp. 537, 542 (S.D. Fla.

5
6  1985) ("[Congress's] purpose would be thwarted were this Court to burden the purchaser with the

7  requirement of claiming actual injury when Congress does not require such a claim."); *Murray v.*

8  *Holiday Isle, LLC*, 620 F. Supp. 2d 1302, 1312-13 (S.D. Ala. 2009) ("[w]hether or not plaintiffs were

9  damaged by the developer's failure to furnish them a property report is irrelevant" to whether they may

10 revoke under § 1703(c)); Appx, B (Ex. 1).

11      The Arbitrator acknowledged that he was disregarding the plain text of the statute, and even

12 attempted to justify his decision to do so on policy grounds that he concluded were part of the statute's

13 legislative history. *See* Award 9 (Ex. 2). In doing so, the Arbitrator contradicted his April Ruling that

14 the legislative history "avails little on the point" (April Ruling 2) (Ex. 20) and paid no heed to the

15 century of Supreme Court law provided by Plaintiffs that prohibits the elevation of legislative history

16
17 over the text of an unambiguous statute (especially where, as here, the legislative history is consistent

18 with the plain statutory text in any event). *See, e.g., Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 417

19 (1998); *United States v. Locke*, 471 U.S. 84, 95 (1985); *Caminetti v. United States*, 242 U.S. 470, 485

20 (1917); Appx, C (Ex. 1). Even the single case the Arbitrator cited on this point holds that "[w]hen the

21 statutory language is clear, and there is no reason to believe that it conflicts with the congressional

22 purpose, then legislative history need not be delved into." *Heppner v. Alyeska Pipeline Serv. Co.*, 665

23 F.2d 868, 871 (9th Cir. 1981). And whatever role legislative history may play, nothing in *Heppner* or

24 any other case supports the Arbitrator's decision to ignore the text *entirely*. *See id.* (at most, legislative

25 history might "require a reevaluation of the meaning *of the statutory language*") (emphasis added).

26      Moreover, the legislative history cited by the Arbitrator contains no suggestion of contrary

27                                          15

28

congressional intent.  The Arbitrator cited it only for the proposition that the enactment of § 1703(d)(2) was "motivated by" abusive installment contract practices.  *See* Award 8-9 (Ex. 2).  Even if that is correct, the motivation for enacting a statute hardly predetermines the reach of every provision in it. Because statutes often address matters beyond their initial motivations, "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79 (1998).  The Arbitrator's heavy reliance on Congress's motivation for enacting § 1703(d), which is in no way inconsistent with the statutory text, only underscores his blatant disregard of the actual law (*i.e.*, the plain language of the statute).

The Arbitrator's discussion of the case law further evinces his disregard for the law.  The Arbitrator refused to follow the actual holdings of the very cases on which he purported to rely, a refusal that is nowhere more evident than in the Arbitrator's discussion of the two opinions in the *Stefan* case.  *See* Award 10 (Ex. 2).  As Plaintiffs repeatedly pointed out, *see* Appx, D (Ex. 1), the decision in *Stefan v. Singer Island Condominiums, Ltd.* ("*Stefan II*"), No. 08-80039, 2009 WL 1515529 (S.D. Fla. May 28, 2009), has nothing to do with the § 1703(d)(2) two-year revocation provision.  The plaintiff in *Stefan II* was clearly *not* seeking to invoke an automatic right of revocation under § 1703(d)(2), because an earlier opinion had *dismissed* his § 1703(d)(2) revocation claims as being "time-barred because they were brought more than two years ... after the Contracts at issue were signed."  *Stefan v. Singer Island Condos. Ltd.* ("*Stefan I*"), No. 08-80039, 2009 WL 426291, at *9 (S.D. Fla. Feb. 20, 2009).  Yet the Arbitrator claimed that, because the abbreviated *Stefan II* opinion does not mention the basis of the plaintiff's claim, it must be a two-year revocation claim.  Award 10 (Ex. 2) ("the court did not mention that fact at all, nor does the opinion in *Stefan II* mention that the purchaser was seeking rescission on some basis other than the statutorily prescribed revocation right.").

Equally indefensible is the Arbitrator's subsequent assertion that it is a "distinction without a difference" that *Stefan II* did not involve the § 1703(d)(2) two-year revocation right, but instead

16

1   involved a different revocation right set forth in § 1709(b). *Id.* As Plaintiffs once again repeatedly

2   pointed out, *see* Appx, E (Ex. 1), ILSA provides two different remedies when a seller fails to include

3   § 1703(d)(2) provisions in a contract.  Section 1703(d) itself provides a remedy:  a purchaser may

4   automatically revoke a contract within two years of signing and is automatically entitled to the return of

5   all money paid. *See* 15 U.S.C. §§ 1703(d), 1703(e); *see also Plant,* 2009 WL 2225415, at *3 n.6.  By

6   contrast, § 1709(b) provides a purchaser with the option of seeking equitable relief, including

7   revocation, within *three* years of signing for a developer's failure to comply with §1703(d)(2), *but does*

8   *not automatically entitle a purchaser to such relief. See* 15 U.S.C. § 1709(b).

9

10      As Plaintiffs repeatedly explained to the Arbitrator, *see* Appx, F (Ex. 1), courts have

11  distinguished between these two provisions, concluding that the revocation right under § 1703(d)(2) (at

12  issue in this case) is unconditional and automatic, whereas revocation under § 1709(b) in an action

13  brought within three years of signing (the remedy at issue in *Stefan*) requires a showing not just that the

14  seller failed to comply with § 1703(d)(2), but also that the relief is fair and equitable under the

15  circumstances. *See, e.g., Plant,* 2009 WL 2225415, at *3 n.6 ("[section] 1709's plain terms make

16  pellucidly clear that equitable remedies … may be ordered, *where justified by the facts of a particular*

17  *case,* for § 1703 violations") (emphasis in original).[2]

18

19  _____

20  [2] To eliminate any uncertainty on this point, Plaintiffs provided the Arbitrator with the actual *Stefan*

21  pleadings.  The *Stefan* plaintiff's second amended complaint confirms that he was proceeding under §

22  1709(b).  Count II of that complaint, which the court was addressing in the relevant portion of *Stefan II,*

23  *see* 2009 WL 1515529, at *2, sought *relief* only under § 1709(b). *See* Feb. 16, 2010 Br. 23-25 (Ex. 21).

24  Yet even after Plaintiffs provided the Arbitrator with the *Stefan* complaint and the summary judgment

25  briefs of both parties to prove this point, *see id.,* Exs. 44, 45, 46, the Arbitrator still refused to

26  acknowledge it. *See* Award 11 (Ex. 2).

27                                                                17

28

Thus, the Arbitrator plainly mischaracterized the holding of *Stefan II* when he claimed that the court "declined to find that the purchaser could *avoid the purchase agreement under § 1703(d)* without determining whether the alleged violation actually damaged the purchaser." Award 10 (Ex. 2) (emphasis added). The Arbitrator's heavy emphasis on something the *Stefan II* court did not hold is proof enough that the Arbitrator manifestly disregarded the law. *Cf. Comedy Club*, 553 F.3d at 1293 (arbitrator manifestly disregards the law by distinguishing case law on grounds that are "fundamentally incorrect").

The Arbitrator evinced the same manifest disregard when relying on *Infinity Global, LLC v. Resort at Singer Island, Inc.*, No. 07-80680, 2008 WL 1711535 (S.D. Fla. Apr. 10, 2008), and *Venezia v. 12th & Division Properties, LLC*, 685 F. Supp. 2d 752 (M.D. Tenn. 2010), which (as the Arbitrator essentially acknowledged) demonstrate nothing more than the fact that not every § 1703 claim is meritorious. *See* Award 9 (finding *Stefan* and *Infinity Global* "helpful" because "[n]either court granted the purchasers the right to revoke"). The revocation claims in these cases failed because the sellers actually *complied* with § 1703. Indeed, in *Infinity Global*, the contract *included* the § 1703(d)(2) protections word for word, notwithstanding the Arbitrator's contrary assertion. *See Infinity Global*, 2008 WL 1711535, at *2 ("Plaintiff does not dispute that the contract contains a provision allowing it to remedy any default within 20 days after notice"); Appx, G (Ex. 1); *but see* Award 9 (claiming *Infinity Global* plaintiff "complained that the Agreements did not afford [her] the protections required under § 1703(d)(2)").

In *Venezia*, the purchaser sought to revoke because the contract failed to mirror precisely the language of § 1703(b): instead of providing that the purchaser may revoke "until midnight of the seventh day" after signing, the contract said the purchaser may revoke within "five business days" of signing, which was just a different way of saying the same thing. *See Venezia*, 685 F. Supp. 2d at 759. Once again, the court held that the seller *complied* with § 1703, concluding "as a matter of law and

18

contract interpretation that there is no functional difference between the seven-day period provided by statute and the period of five business days provided by contract." *Id.* The court said nothing about whether revocation under § 1703 requires an "inquiry into harm caused by such violation," Award 11, because the court held that there was no § 1703 violation in the first place. *See* Day 5 Hearing Tr. 1136:25-1137:10 (Ex. 15).

Lacking any legal support, the Arbitrator next claimed that the testimony of a former HUD attorney (and Trump expert) "confirmed the relevance of harm to actionable violations of § 1703(d)." Award 11 (Ex. 2). Even if "expert testimony" were somehow relevant to this question of law, however, the witness testified to no such thing. Instead, he readily conceded (in testimony repeatedly presented to the Arbitrator)[3] that a § 1703(d)(2) violation requires *no* showing of harm to the purchaser. Day 3 Hearing Tr. 781:2-15, 781:21-24 (Ex. 13); Rothman Dep. 52:1-12 (Ex. 22); Appx, I (Ex. 1). Beyond that, the witness testified that HUD has *never* exercised its prosecutorial discretion to bring an enforcement action for a § 1703(d)(2) violation. Day 3 Hearing Tr. 724:23-725:2, 788:12-14 (Ex. 13). The Arbitrator's misuse of the witness's testimony to manufacture support for his holding that harm to the purchaser is a "critical" component of a §1703(d)(2) revocation claim is further evidence of the Arbitrator's manifest disregard of the law.

Remarkably, in the face of the foregoing authorities and expert testimony, the Arbitrator concluded that "[t]he relevance of harm to a purchaser . . . has not been contradicted by any case law, brought to the Arbitrator's attention, or testimony in this case." Award 11 (Ex. 2). This is nothing short of an admission by the Arbitrator that he disregarded all of the law and evidence presented at the

---

[3] Plaintiffs have brought to the Arbitrator's attention on numerous occasions testimony from not only the former HUD attorney, but from both of Trump's ILSA expert witnesses, in addition to black letter law, confirming that harm is irrelevant. Appx, H (Ex. 1).

19

hearing and discussed above.  The Arbitrator's conclusion -- that revocation under § 1703(d)(2) requires some showing of harm to the purchaser -- has no basis in the statute (that he ignored), the case law (that he ignored or mischaracterized), the testimony (that he ignored or mischaracterized), or the irrelevant legislative history.  Instead, "[t]he conclusion is inescapable that the [arbitrator] simply imposed [his] own conception of sound policy." *Stolt-Neilsen*, 130 S. Ct. at 1769.  The Arbitrator may believe that revocation is "too severe a [remedy]" unless noncompliance with § 1703(d)(2) results in proven harm to the purchaser, but "that choice [of remedies] has already been made by Congress." *Am. Postal Workers*, 682 F.2d at 1285.  Because the Arbitrator's Award reflects not an interpretation, but a policy-driven rejection and revision of § 1703(d)(2), confirming the Award would impermissibly "empower the arbitrator to nullify the mandates of Congress." *Id.*; *see also Kashner Davidson Sec. Corp. v. Mscisz*, 531 F.3d 68, 78 (1st Cir. 2008) (arbitrator's "disregard of the unambiguous text of a [governing] provision cannot be deemed a mere interpretation").

**B.    The Arbitrator's Application of the Savings Clause is Completely Irrational and Manifestly Disregards Overwhelming Case Law to the Contrary.**

Notwithstanding his finding that "Claimants' rights to written notice of and the opportunity to cure monetary defaults was limited by the language of the Agreements" (Award 11 (Ex. 2)), the Arbitrator concluded that Trump "cured" its noncompliance with § 1703(d)(2) by including a generic savings clause in the Agreement.  In addition to once again ignoring the plain language of the statute, that conclusion rests on an irrational reading of the contract and manifest disregard of the case law.

As an initial matter, the savings clause in the Agreement cannot cure noncompliance with the statute because it did not and cannot cure the Agreement's failure to disclose the notice-and-cure right of § 1703(d)(2).  The Arbitrator acknowledged that § 1703(d)(2) requires a seller to disclose a right to notice and cure in the "contract." April Ruling 2 (Ex. 20).  As the Arbitrator himself explained, ILSA achieves its objectives "through disclosure." Award 7 (Ex. 2).  Far from *disclosing* an unconditional

20

1    right to notice and cure, the Agreement expressly *excluded* that right, as explained above. Even

2    Trump's experts admitted that a purchaser would not believe that he had a notice and cure right from

3    reading the Agreement. Day 4 Hearing Tr. 905:4-9, 905:14-18 (Ex. 14); Sklar Dep. 116:13-17 (Ex.

4    23); Appx, J (Ex. 1). Because nothing in the generic "savings" clause provided the required disclosure,

5    it cannot "save" Trump from its non-disclosure. *See Coast Trading*, 681 F.2d at 1197 ("[an] award is

6    legitimate only so long as it draws its essence from the ... agreement") (internal quotation omitted).

7

8         Moreover, even if a savings clause could "cure" a § 1703(d)(2) violation in some

9    circumstances, by its terms Trump's savings clause does not cure the Agreement's noncompliance with

10   § 1703(d)(2). This inability to cure Trump's noncompliance is not surprising since the savings clause

11   was not drafted for the purpose of ensuring compliance with ILSA. Day 3 Hearing Tr. 543:17-544:15

12   (Ex. 13). Section 1703(d)(2) requires that the relevant protections exist and disclosures occur in the

13   "contract" *at the time of signing*. If a seller could provide the protections and disclosures later, the

14   statute would be nonsensical, as its revocation period begins to run "from the time of signing of such

15   contract." 15 U.S.C. § 1703(d); *see also Orpheus Invs., S.A. v. Ryegon Invs., Inc.*, 447 So. 2d 257, 259

16   (Fla. Dist. Ct. App. 1983) (Section 1703 non-disclosures "can only occur, they in fact spring into being,

17   at the moment the contract of sale is entered into. The omissions become such at the moment of

18   contract formation, not at some later moment of contract fulfillment."); Sklar Dep. 142:4-7

19   (acknowledging that "the intent behind 1703(d)(2) is to place a buyer on notice of the right to notice

20   and cure") (Ex. 23). But Trump's savings clause strikes an offending provision only when an

21   interpretation of the provision in question "results in a final determination ... that Buyer has the right to

22   cancel this Agreement." Agreement ¶ 24.6/25.6 (Ex. 10). Thus, by its own terms, the clause has no

23   effect until there has been legal proceedings resulting in "a final determination" that the notice-and-cure

24   provision was deficient, which indisputably could not happen when purchasers signed their

25   Agreements. Accordingly, the savings clause cannot "cure" Trump's failure to comply with §

26

27                                                      21

28

1703(d)(2) at the time of signing. *See Mo. River Servs., Inc. v. Omaha Tribe of Neb.*, 267 F.3d 848, 855 (8th Cir. 2001) (an arbitrator "[i]s not free to disregard ... unambiguous language" in a contract); Appx, L (Ex. 1). The Arbitrator's contrary conclusion permitted Trump to nullify the (undisclosed) revocation right altogether.[4]

Additionally, the Arbitrator exceeded his authority by issuing an award that considered the effect of the savings clause at all. According to its terms, the savings clause operates only upon a "final determination" that the Agreement does not comply with § 1703(d)(2) and the purchaser has a revocation right. Agreement ¶ 25.6 (Ex. 10). Here, the Arbitrator expressly ruled that Trump substantially complied with § 1703(d)(2), meaning there was no "final determination" that the Plaintiffs have a revocation right. Given the absence of such a "final determination," the Arbitrator's award directly conflicts with and fails to draw its essence from the parties' agreement and thus must be vacated. *See United Food & Commercial Workers Union, Local 1119, AFL-CIO v. United Markets*, 784 F.2d 1413, 1415-16 (1986) (concluding that if an arbitrator's interpretation of an agreement is in direct conflict with or "violates the terms of the agreement, the court cannot enforce the award"); *Coast Trading*, 681 F.2d at 1197 (holding that an "arbitrator is confined to the interpretation and application of the parties' agreement" and an "award is legitimate only so long as it draws its essence from the... agreement") (quoting *United Steelworkers*, 363 U.S. at 597 (internal quotation omitted)); *Fredrick Meiswinkel, Inc. v. Laborer's Union Local 261*, 744 F.2d 1374, 1376 (9th Cir.1984) ("An award that conflicts directly with the contract cannot be a 'plausible interpretation.'") (citation omitted)).

---

[4] The savings clause could not cure Trump's failure to comply with § 1703(d)(2) in any event because the savings clause by its terms only strikes language that limits a legally enforceable right of a purchaser. *See* Agreement ¶ 24.6. Because the notice-and-cure provision is optional, it is not such a "right." *Pugliese*, 524 F. Supp. 2d at 1372; May 27, 2010 Br. 34-27 (Ex. 28).

22

Furthermore, as courts refusing to enforce savings clauses in the ILSA context have explained, enforcement of such clauses to "cure" § 1703 defects "would undermine public policy and defeat Congress's purpose in creating this consumer-protection legislation." *Harvey v. Lake Buena Vista Resort, LLC*, 568 F. Supp. 2d 1354, 1365 (M.D. Fla. 2008) (internal quotations omitted). Enforcement of a savings clause to belatedly eliminate contractual language would incentivize inclusion of deficient contractual provisions in the first place, and would allow a seller to use a savings clause "to exonerate itself from running afoul of [ILSA] requirements in hypothetically limitless ways." *Kabula v. S. Homes of Homestead VIII, Inc.*, No. 08-20685, 2008 WL 2741154, at *2 (S.D. Fla. July 14, 2008); *see also* Appx, K (Ex. 1).

Those concerns are particularly relevant here, given Trump's concession that it continued to use the offending language after learning that it was noncompliant with § 1703(d)(2) on the theory that the savings clause could "cure" it. As explained above, *see supra* pp. 7-8, when Trump entered into Agreements with Plaintiffs, Trump indisputably *knew* that the exceptions to the notice-and-cure provision were included. Day 3 Hearing Tr. 395:22-396:8 (Ex. 13); Day 4 Hearing Tr. 506:14-21, 542:1-8, 543:17-23 (Ex. 14). Trump also admits that, although it later learned that the contract language did not comply with § 1703(d)(2), Trump deliberately declined to rectify that deficiency. Award 2 (Ex. 2); *see also* Day 2 Hearing Tr. 371:7-372:13, 372:14-20, 373:5-9 (Ex. 12); Day 3 Hearing Tr. 513:9-2 (Ex. 13).

The Arbitrator once again manifested his disregard for the law by mischaracterizing relevant case law on this point. According to the Arbitrator, *Harvey* and *Kabula* are outliers, and "most [ILSA] cases decided since *Harvey* … have not found 'savings clauses' unenforceable." Award 16 (Ex. 2). The Arbitrator cited nothing in support of that sweeping assertion. Nor could he have. Of all the cases located by either party involving savings clauses in the ILSA context (all of which were on multiple occasions provided to the Arbitrator), only a single, unpublished and non-precedential order enforced a

savings clause. *See Dubois v. Home Dynamics Murano, LLC*, Case No. 07-61082-CIV-

LENARD/GARBER, S.D. Fla. June 17, 2008 Order. That order makes no mention of *Harvey*,

*Kabula*, or the public policy concerns those and other cases raise. *See id.*

The Arbitrator's assertion that "courts have enforced contract 'savings clauses' to cause

contracts to be exempt from ILSA" is equally baseless. Award 16 (Ex. 2). Of the five cases the

Arbitrator cited in support of that assertion, only one (the same *Dubois* order) lends any support.

Contrary to the Arbitrator's characterization, the other four cases held that the challenged contractual

provision *complied as written* with the relevant ILSA exemption, leaving nothing for the savings clause

to "save." Appx, M (Ex. 1). Likewise, *every* other opinion the parties provided to the Arbitrator

addressing the efficacy of a savings clause held that a savings clause did *not* render the contract at issue

exempt from ILSA. *See, e.g., Harvey*, 568 F. Supp. 2d at 1365; *Kabula*, 2008 WL 2741154, at *2;

Appx. N (Ex. 1).

The Arbitrator also manifestly disregarded overwhelming analogous authority holding that a

savings clause cannot salvage a contractual provision that unambiguously violates a statute. Appx, O

(Ex. 1). Although the Arbitrator correctly pointed out that many of these cases involve usury

provisions, he provided no reason why the principle these cases set forth is not equally applicable in

this context. *See* Award 15. Nor could he, as enforcement of a savings clause is *uniformly* against

public policy when it would encourage parties to draft agreements that contain illegal provisions.

Appx, P (Ex. 1).

Finally, in what can only be deemed proof positive of the irrationality of his analysis, the

Arbitrator concluded that the savings clause must be held enforceable because "Trump complied with

the Act by registration and [the savings clause] must be applied to preserve that compliance." Award

16-17 (Ex. 2). The Agreement's savings clause has no possible application with respect to Trump's

registration of its property with HUD. Nor does registration have anything to do with whether the

24

1    Agreement complied with the requirements of § 1703(d)(2). Because the registration and contract

2    provision requirements are separate, compliance with one hardly constitutes compliance with the other.

3    *See* 15 U.S.C. § 1716 ("[t]he fact that a statement of record . . . has been filed . . . shall not be deemed a

4    finding by the Secretary that the statement of record is true and accurate on its face, or be held to mean

5    the Secretary has in any way passed upon the merits of, or given approval to, such subdivision."); *see*

6    *also Husted v. Amrep Corp.*, 429 F. Supp. 298, 311 (S.D.N.Y. 1977); Appx, Q (Ex. 1). Section 1703

7    does not provide a menu of provisions from which a seller may pick and choose. Instead, it plainly

8    requires a seller to comply with each and every one of its requirements to avoid revocation by the

9    purchaser. *See* 15 U.S.C. § 1703(b)-(d) (permitting revocation in three *separate* circumstances).

10

11        The Arbitrator's reliance on Trump's compliance with a *different* requirement can only be

12   explained by his apparent belief that a seller's overarching "intent" to comply with ILSA (or with most

13   of ILSA's requirements) should insulate it from liability. That may be the Arbitrator's "own

14   conception of sound policy," *Stolt-Nielsen*, 130 S. Ct. at 1767, but it manifestly disregards the law for

15   the reasons explained above, and for the additional reason that § 1703(d)(2) is a strict liability

16   provision. Even if that were not obvious on the face of the statute, courts have repeatedly concluded

17   that none of § 1703's provisions require intent, *see, e.g., Law v. Royal Palm Beach Colony, Inc.*, 578

18   F.2d 98, 101 (5th Cir. 1978); *Burns v. Duplin Land Dev., Inc.*, 621 F. Supp. 2d 292, 306 (E.D.N.C.

19   2009); *Hester v. Hidden Valley Lakes, Inc.*, 495 F. Supp. 48, 53 (N.D. Miss. 1980), and have routinely

20   deemed ILSA a "strict liability statute." *200 East Partners, LLC v. Gold*, 997 So. 2d 466, 469 (Fla.

21   Dist. Ct. App. 2008); *accord Grove Towers, Inc. v. Lopez*, 467 So. 2d 358, 361 (Fla. Dist. Ct. App.

22   1985); *Adams-Lipa v. TDS Town Homes (Phase 1) LLC*, No. 8:08-CV-1783, 2009 WL 1850267, at *2

23   (M.D. Fla. June 25, 2009); *Veneklase v. Bridgewater Condos, L.C.*, No. 1:09-CV-321, 2010 WL

24   1981424, at *1 (W.D. Mich. May 17, 2010); *Tedder v. Harbour Phase I Owners, LLC*, No. 8:08-CV-

25   1674, 2009 WL 1043911, at *2 (M.D. Fla. Apr. 17, 2009) ("As a strict liability statute enacted for the

26

27                                                        25

28

1   purpose of protecting the public, [ILSA] should be liberally construed in favor of the public.") (internal

2   quotation omitted); Appx, R (Ex. 1). The Arbitrator disregarded even the unequivocal testimony of the

3   former HUD attorney -- whose testimony the Arbitrator mischaracterized to support his other

4   conclusions -- that § 1703(d)(2) is a strict liability provision. Rothman Dep. 71:23-72:7 (Ex. 22); Day

5
6   3 Hearing Tr. 767:15-768:16, 772:11-773:17 (Ex. 13); Appx, S (Ex. 1).[5] For that reason as well,

7   Trump's purported intent to comply with ILSA provides no support for the conclusion that the

8   Agreement defeated the statutory revocation right even though it did not disclose an unconditional

9   notice-and-cure right and instead stated that no such right exists.

10          **C.      Trump Could Not and Did Not "Substantially Comply" with § 1703(d), and the
                    Arbitrator's Decision to the Contrary Manifestly Disregards the Law.**
11
12          Finally, the Arbitrator's conclusion that he could invoke some sort of "traditional equitable

13   powers" to find that Trump "substantially complied" with § 1703(d) evinces just how deeply flawed his

14   Award was. *See* Award 18-19 (Ex. 2). It is black letter law that substantial compliance does not

15   excuse the failure to comply with the plain requirements of a statute. *See Las Vegas Convention &*

16   *Visitors Auth. v. Miller*, 191 P.3d 1138, 1149 (Nev. 2008) (it would violate "a basic principle of

17   statutory construction" to "hold that the complete absence of [compliance with statutory] elements

18   sufficed for substantial compliance"); *see also Johnson v. Herseth*, 246 N.W.2d 102, 107 (S.D. 1976)

19   (holding that the court could not "read the filing requirement itself out of the statute under the guise of

20

21   _____

22   [5] The Arbitrator relied on a single, distinguishable, outlier case to reach the indefensible conclusion

23   that § 1703(d)(2) is not a strict liability statute. *See* Award 19 (citing *Meitis v. Park Square Enters.,*

24   *Inc.*, No. 6:08-CV-1080, 2009 WL 3367335 (M.D. Fla. Oct. 15, 2009) (Ex. 2)). In doing so, the

25   Arbitrator manifestly disregarded the plain language of the statute and overwhelming authority to the

26   contrary.

27                                            26

28

1  liberal construction," as doing so would be "violence to the plain language of the statute."). *Congress*

2  made the policy decision here when it specified that, unless a contract discloses an unconditional right

3  to notice and cure, the buyer has a two-year right to rescission. For an arbitrator to decide that some

4  other action is good enough to defeat the revocation right is, quite overtly, manifest disregard of the law

5  enacted by Congress. By definition, substantial compliance is not actual compliance, which is what

6  Congress required as the price for eliminating the revocation right.

7

8       Because the contractual requirements of § 1703 are clear and unequivocal, courts have

9  repeatedly and unanimously rejected the argument that a seller may achieve substantial compliance

10  through conduct at a different time or in a different manner than the statute requires. *See, e.g., Law,*

11  578 F.2d at 100-01 (rejecting argument that seller substantially complied with § 1703(c) by sending

12  purchasers property reports after they signed contracts but before the seller signed to make the contract

13  binding); *Rockefeller v. High Sky, Inc.*, 394 F. Supp. 303, 305 (E.D. Pa. 1975) (rejecting argument that

14  seller substantially complied with § 1703(c) by verbally disclosing information that seller should have

15  provided in a property report before the purchaser signed the contract); *Burns,* 621 F. Supp. 2d at 307

16  (rejecting argument that seller substantially complied with ILSA's property report requirements by

17  providing the purchaser with statutorily required information that was excluded from property report);

18  Appx, T (Ex. 1).[6]

19

20       Indisputably, Trump did not comply with the statute's single, unambiguous mandate, as the

21  Agreement did not contain or disclose an unconditional right to notice and cure in the event of any

22

23  _____

[6] ILSA is a strict-liability statute, and it is well-settled that equitable defenses like substantial

24  compliance may not be read into a strict liability statute. *See, e.g.*, 27A Am. Jur. 2d Equity § 4; *Md.*

25  *Dep't. of the Env't v. Underwood*, 792 A.2d 1130, 1142 (Md. 2002); *Harrel v. Talley*, No. 06CA41,

26  2007 WL 2137511, at *2-3 (Ohio App. July 23, 2007); Appx, U (Ex. 1).

27                                          27

28

1   default. *See* Agreement ¶ 17.1/18.1 (Ex. 10). The Arbitrator did not conclude otherwise, but rather

2   found that Trump nonetheless "substantially complied" with § 1703(d)(2) by complying with *other*

3   provisions of ILSA, namely, by filing a statement of record and by providing purchasers with a

4   property report. *See* Award 18 (Ex. 2); *see also id.* 8.

5        The suggestion that Trump could "substantially comply" with one ILSA provision by

6   complying with a separate provision, however, is nothing short of absurd. As a matter of law, equity,

7

8   and simple common sense, compliance with one provision cannot excuse noncompliance with another

9   provision, as discussed above. *See Las Vegas Convention*, 191 P.3d at 1149 (doctrine of substantial

10   compliance cannot be used to "render the[] inclusion [of any provision] in the statute nugatory"). The

11   Arbitrator's contrary assertion is a glaring testament to the extent to which he manifestly disregarded

12   the governing law in pursuit of his "own brand of industrial justice." *Coast Trading*, 681 F.2d at 1197.

13        The Arbitrator's heavy reliance on Trump's representation of a notice-and-cure right *in the*

14   *property report* is especially misplaced. Award 18 (Ex. 2). Contrary to the Arbitrator's assertion that

15   Trump satisfied "the preeminent objective of ILSA" to provide certain disclosures by delivering a

16

17   property report, *id.* 20, the actual statute, which the Arbitrator disregarded, expressly mandates that the

18   notice-and-cure right be included *in the contract*. *See* 15 U.S.C. § 1703(d) ("[a]ny *contract* ... which

19   does not provide [notice-and-cure] may be revoked at the option of the purchaser") (emphasis added).

20   "[H]ad Congress intended to provide developers with an alternative means of furnishing information to

21   purchasers, it could have said so very plainly and simply." *Rockefeller*, 394 F. Supp. at 305.

22        Moreover, even if a seller could substantially comply with § 1703(d)(2) by providing a notice-

23   and-cure right in some other document, a seller most assuredly could not do so by simultaneously

24   *excluding* that right in the contract, which is the governing document. Since that is precisely what

25   Trump did here, the property report could not possibly have rendered Trump's actions substantially

26   compliant with § 1703(d)(2).

27

28

1

Nor did Trump substantially comply with § 1703(d)(2) by belatedly disavowing reliance on the

2 Agreement's notice-and-cure exceptions. Award 18 (Ex. 2). The statute mandates that a *"contract"*

3 include a notice-and-cure right *at the time that it is signed,* and the two-year revocation remedy runs

4 from the time the contract is signed. *See supra* p. 21. Thus, compliance must occur, if at all, at the time

5 the contract is signed. The Arbitrator's ruling that Trump could substantially comply by giving notice

6
7 and an opportunity to cure at a later time reads the requirement that the notice and cure right be in the

8 contract at the time of signing out of the statute and renders the two-year revocation remedy from the

9 time of signing meaningless. *Univ. of Nev., Reno v. Stacey*, 997 P.2d 812, 815 (Nev. 2000) (refusing to

10 adopt defendant's interpretation of contract because doing so would render other contractual provisions

11 meaningless). Accordingly, the Arbitrator's decision effectively rendered the statute meaningless by

12 nullifying both the disclosure requirement and the revocation remedy for non-disclosure.

13

Eliminating both the disclosure requirement and the revocation remedy is exactly what Trump

14 sought to achieve in this instance. Upon learning of the deficiencies in its Agreement, Trump did not

15 attempt to amend past Agreements or to fix the notice-and-cure provision going forward. *See* Day 2

16
17 Hearing Tr. 317:1-17 (Ex. 12); Day 3 Hearing Tr. 655:20-25 (Ex. 13). Trump instead continued to use

18 the deficient Agreement with the hope of concealing its noncompliance from past purchasers and then

19 attempted to discretely preempt future revocation claims by providing purchasers with a notice-and-

20 cure right after the fact. *See* Day 2 Hearing Tr. 458:25-460:14 (Ex. 12). Whatever might constitute

21 compliance with § 1703(d)(2), Trump's decision to deliberately ignore the provision's sole (disclosure)

22 requirement and conceal the revocation right from purchasers hardly qualifies.[7]

23

24 _____

[7] Additionally, the Arbitrator ignored Plaintiffs' authority that a party knowledgeable of its
25
noncompliance with a statute cannot substantially comply. *Sawyer v. County of Sonoma*, 719 F.2d
26
1001, 1008 (9th Cir. 1983) ("[T]he doctrine of substantial compliance can have no application in the
27

28

1    Plaintiffs could not possibly catalogue in a mere thirty pages all the instances of manifest

2  disregard of the law in the Arbitrator's findings and conclusions. *See* (Ex. 2). But even the limited

3  examples provided above leave no room for doubt that the Arbitrator interpreted and applied neither the

4  law nor the Agreement. Instead, the Arbitrator relied on nothing more than his "personal notions of

5  right and wrong," *Patten*, 441 F.3d at 235, and then ignored or mischaracterized the legal authorities

6

7  and evidence to fit his policy-based conclusion. As explained above, such blatant mischaracterizations

8  of the law and evidence manifest the Arbitrator's disregard for the law and the irrationality of the

9  Award, and thus cannot withstand even the most deferential level of scrutiny.

10                          **CONCLUSION**

11    Plaintiffs respectfully request that this Court vacate the Award and enter a ruling in favor of all

12  Plaintiffs who invoked their revocation right within two years of the signing of their Agreements.

13        This 28th day of January, 2011.

14                                    Respectfully submitted,

15
                                      s/ Ben F. Easterlin IV
16                                    Ben F. Easterlin IV
                                      KING & SPALDING LLP
17
                                      Aaron D. Lovaas
18                                    Kristan E. Lehtinen
                                      LOVAAS & LEHTINEN, P.C.
19
                                      Attorneys for Plaintiffs
20                                    Mary Ann Blanco et al.

21

22

23
_____
24  context of a clear statutory prerequisite that is known to the party seeking to apply the doctrine."); *Dirks*

25  *v. Comm'r of Internal Revenue*, 154 Fed. Appx. 614 (9th Cir. 2005); May 27, 2010 Br. 57-60 (Ex. 28).

26
    Trump was aware of its noncompliance no later than November 2005. *See supra* pp. 7-8.
27                                      30

28

1
2
3

## CERTIFICATE OF SERVICE

4
5      The undersigned counsel hereby certifies that a true and correct copy of the foregoing

6   **PLAINTIFFS' MOTION TO VACATE ARBITRATION AWARD AND**

7   **MEMORANDUM OF POINTS AND AUTHORITIES** was electronically filed with the Clerk

8   of Court using the CM/ECF system which will automatically send email notification of such

9   filing to the attorneys of record in this case.

10
11
12   This 28th day of January 2011.

13
14
15                                         s/ Aaron D. Lovaas
                                           Aaron D. Lovaas
16                                         Nevada Bar No. 5701

17
18
19
20
21
22
23
24
25
26
27
28