PATRICK G. BYRNE, ESQ.
Nevada Bar No. 7636
ALEX L. FUGAZZI, ESQ.
Nevada Bar No. 9022
JUSTIN L. CARLEY, ESQ.
Nevada Bar No. 9994
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Ste. 1100
Las Vegas, Nevada 89169
Tel.: (702) 784-5200
Fax.: (702) 784-5252
Email:  pbyrne@swlaw.com
         afugazzi@swlaw.com
         jcarley@swlaw.com

STEVE MORRIS, ESQ.
Nevada Bar No. 1543
MORRIS PETERSON
300 South Fourth Street, Suite 900
Las Vegas, NV 89101
Tel.: (702) 474-9400
Fax.: (702) 474-9422
Email: sm@morrislawgroup.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARY ANN BLANCO, ET AL., | CASE NO. 2:11-cv-00153-GMN-PAL |
| Plaintiffs, | |
| vs. | |
| TRUMP RUFFIN TOWER I LLC, | **OPPOSITION TO MOTION TO VACATE ARBITRATION AWARD AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| Defendant. | |

Trump Ruffin Tower I LLC, through its attorneys Morris Peterson and Snell & Wilmer L.L.P., files this Opposition ("Opposition") to Plaintiffs' Motion to Vacate Arbitration Award and Memorandum of Points and Authorities ("Plaintiffs' Motion").  This Opposition is based on the attached Memorandum of Points and Authorities, all pleadings and papers on file herein, and any oral argument this Court may choose to hear.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  **INTRODUCTION**

In the wake of the crashing real estate market, Plaintiffs hoped to rescind their investment in the Trump Hotel by relying on a purported violation of the Interstate Land Sales Full Disclosure Act ("ILSA").  Despite dedicating several pages of their brief to alleged fraudulent actions by Trump, the claim at issue has nothing to do with fraud or misrepresentations.  In fact, it has nothing to do with Plaintiffs' failure to close on the condominium units.  Instead, Plaintiffs seek to revoke their purchase agreements based on an alleged violation of ILSA—Trump's failure to set forth in the Agreements a buyer's right to written notice of defaults and 20 days to cure such defaults.  They assert this claim even though (1) Trump *informed* Plaintiffs of this unfettered right in a federally mandated disclosure document provided before they signed their Agreements, and (2) in fact, Trump *actually gave* them written notice of every default and, in most cases, many more than 20 days to cure.  In short, Plaintiffs hope to seize on an alleged ILSA violation even though Plaintiffs received exactly the benefits intended to be conferred by the statute and suffered no harm.[1]

Plaintiffs filed arbitration against Trump and pursued this novel claim with vigor, and the Arbitrator gave them every opportunity to support it.  The Arbitrator allowed Plaintiffs to conduct extensive discovery, including depositions of virtually every Trump representative involved, including Donald J. Trump and Trump's lawyers.  Since the commencement of the action, the parties presented the Arbitrator with hundreds of pages of legal briefings and exhibits, dozens of cases from multiple jurisdictions, extensive testimony from expert witnesses and many hours of argument in hearings held over 7 different days, including a 5-day evidentiary hearing

---

[1]  The Eleventh Circuit, home to Florida and its historic real estate crash, accurately described the phenomenon presented to the Arbitrator in this case:

> After the housing bubble burst, the [purchasers] had second thoughts about their decision to purchase the condominium unit. Wanting out of their contract, they seized on to [ILSA], a federal statute that has become an increasingly popular means of channeling buyer's remorse into a legal defense to a breach of contract claim.

*Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 852 (11th Cir. 2009) (internal citations omitted).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

held July 19 through July 24, 2010.[2]   After taking 60 days to consider the parties' extensive arguments, citations to authority and evidence adduced at the final evidentiary hearing, the Arbitrator produced a 32-page written order that clearly identified and carefully addressed every legal and factual issue raised by the parties.  *See* Arbitrator's Order, Findings, and Conclusions on Claimants' Causes of Action Seeking to Enforce Rescission Pursuant to 15 U.S.C. § 1703(d), dated November 1, 2010, (the "Final Order"), p. 6, attached to Plaintiffs' Motion as Ex. 2.

Plaintiffs now incredibly ask this Court to set aside the Arbitrator's Final Order on the basis that the Arbitrator "manifestly disregarded" the law.   An objective review of the Arbitrator's well-reasoned Final Order quickly dispatches any such notion.  First, as both parties conceded, there was no controlling law on the novel issues presented and, thus, nothing to disregard.   Second, with respect to the substantial law that was presented, it was appropriated considered and addressed in significant detail.   The Arbitrator's decision is not only well supported -- it correctly decides all issues.  This well reasoned decision must be upheld.[3]

## II.  STANDARD OF REVIEW

Plaintiffs seek to vacate the Final Order under 9 U.S.C. § 10(a)(4) of the Federal Arbitration Act ("FAA"), which permits a District Court to vacate an arbitration award when the arbitrator "exceeded [his] powers."  *See* Plaintiffs' Motion, p. 11:24-25. An arbitrator, however, does not exceed his powers merely because Plaintiffs do not like the result.  In fact, the Ninth Circuit has commented that an unfavorable result is an assumed risk of arbitration:

> The risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that attempts in good faith to interpret the relevant law, or may make errors with respect to the evidence on which they base their rulings, is a risk every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by §10 (a)(4).

*Bosack v. Soward*, 586 F.3d 1096, 1107 (9th Cir. 2009) (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 351 F.3d 987, 1003 (9th Cir. 2003).

---

[2] *See infra* Section III.C for a discussion of the procedural background.

[3] The Final Order contains a number of findings that are not being challenged by this Motion that must be upheld, including: (1) "The Arbitrator finds that 2-year revocation period cannot be extended"; (2) "Claimants only have the option to revoke under §1703(d) for 2 years from the date such Claimants sign their respective Agreements"; and (3) "The Arbitrator finds that Claimants do not qualify for equitable tolling of the 2-year revocation period in § 1703(d)."  See Final Order, pp. 22, 25 and 28, respectively.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

To successfully vacate the Arbitrator's order, Plaintiffs must prove that the Arbitrator manifestly disregarded the law. This "requires 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law.'" *Collins v. D.R. Horton*, 505 F.3d 874, 879 (9th Cir. 2007) (citing *San Martine Compania de Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9th Cir. 1961)). The Ninth Circuit Court of Appeals put it this way: "it is not enough to show that the [Arbitrator] committed an error—or even a serious error. Arbitrators exceed their powers not when they merely interpret or apply the governing law incorrectly, but when the award is completely irrational, or exhibits a manifest disregard of law." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th Cir. 2010) (internal quotations, citations, ellipses, and formatting omitted). Thus, even assuming Plaintiffs could show a mistake in applying the law, "[i]t must be clear from the record that the [Arbitrator] recognized the applicable law and then ignored it." *Id.* (citing *Mich. Mut. Ins. Co. v. Uniguard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995).

In conducting the limited review required under the "manifestly disregard" standard, Section "10 of the FAA does not sanction judicial review of the merits, and whether or not the [Arbitrator's] findings are supported by the evidence in the record" is beyond the scope of review. *Lagstein*, 607 F.3d at 640-641 (internal quotations, citations, ellipses, and formatting omitted) (citing *Collins*, 505 F.3d at 879, and *Bosack*, 586 F.3d at 1102).

The record here demonstrates that the Arbitrator took his role seriously and set out to understand and interpret the law in good faith. During one of the hearings, he explained to counsel:

> There's some authority I want to check very carefully, and then, obviously, writing a reasoned decision that will provide value to the parties and also withstand potential third-party scrutiny, very important to me. Mr. Easterlin mentioned earlier the *Hall Street* case which discussed manifest disregard of the law standard and so forth. *You can rest assured there will be no manifest disregard of the law here.* I think counsel has very clearly argued the law, and I understand how much this case turns on the law. *Hall Street* basically stands for the proposition an Arbitrator can be wrong on the law, but *you can't intentionally disregard a well-established principle of law. So that certainly won't happen here.*

1  *See* March 12, 2010 Hearing Tr. p. 229:9-23 (emphasis added), a copy of which is attached to

2  Plaintiff's Motion as Ex. 26 ("March 2010 Hearing Tr.").

3      Far from being the "easy case" as now claimed by Plaintiffs, this case presented a novel

4  legal theory with legal questions of first impression. *See* Final Order, p. 6:25. The complexity

5  of the issues was expressly acknowledged by Plaintiffs' counsel: "[B]ut the truth is that this is a

6  very complicated matter of a great deal of seriousness for both sides...." *See* March 2010

7  Hearing Tr. p. 226:14-16. Similarly, in the final hearing, Plaintiffs' counsel conceded:

8      [T]his stuff is complicated. It's confusing. We have been, all of us, both sides,
   whether everybody wants to admit it or not, has been confused from time to time.
9      When we did those motions in June of 2009, we didn't understand strict liability,
   we didn't understand about strict compliance, we didn't know the law, we didn't
10     give you what you needed to give a ruling. That's why I feel it's really
   worthwhile to go through all of this because it is easy, *it is easy not to get it all*
11     *right.*

12

13  *See* July 19, 2009 Hearing Tr. p. 89:2-12 (emphasis added), a copy of which is attached to

14  Plaintiffs' Motion as Ex. 11.

15      The complexity of the issues combined with the absence of binding precedent is enough

16  for this Court to find that the Arbitrator could not have manifestly disregarded the law.[4]  A

17  review of the Final Order and the law cited therein, however, makes that conclusion even more

18  compelling because the Arbitrator correctly interpreted and applied the law.

19                          III. **BACKGROUND**

20  A.    **ILSA**

21      The issues presented relate to ILSA.  15 U.S.C. § 1701 *et seq.*  As described by the

22  Arbitrator in the Final Order:

23      ILSA was enacted in 1968 "to protect purchasers from unscrupulous sales of
   undeveloped home sites, frequently involving out-of-state sales of land
24     purportedly suitable for development but actually under water or useful only for
   grazing." *Winter v. Hollingsworth Props. Inc.*, 777 F.2d 1444, 1447 (11th Cir.

25

26  _____
   [4]  *See Collins*, 505 F.3d at 884 ("[W]e resolve this case on the basis that '[t]he governing law alleged to have been
   ignored by the arbitrators [was not] *well defined, explicit, and clearly applicable.*' In short, the arbitrators could not
27  manifestly disregard the law because no binding precedent existed....") (internal citations omitted) (emphasis in
   original); *see also Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004) (citing *Merrill Lynch, Pierce,*
28  *Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 934 (2d Cir. 1986)) ("The governing law alleged to have been
   ignored by the arbitrators must be well defined, explicit, and clearly applicable.").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   1985).  It is equally well-established that the protection afforded to purchasers by
2   ILSA is principally accomplished through disclosure.  *E.g.*, *id.* (ILSA "is an anti-fraud statute utilizing disclosure as its primary tool.").

3   *See* Final Order at p. 7:13-18.  To ensure that buyers receive the required disclosures in non-
4   exempt[5] projects, ILSA makes unlawful certain interstate sales activities unless a developer
5   registers the residential real estate development with the Department of Housing and Urban
6   Development ("HUD") by filing a statement of record that discloses certain information required
7   under ILSA and HUD regulations promulgated pursuant to ILSA.  *See generally* 15 U.S.C. §§
8   1703, 1704, 1705 and 1707,[6] and 24 C.F.R.  §§ 1710.100–1710.216.   In connection with
9   registering a project with HUD by filing a statement of record, developers are required to prepare
10  and submit a "property report," which is the disclosure document to be provided to purchasers.
11  *See* 15 U.S.C. § 1703(a)(1)(B); 24 C.F.R. § 1710.100.

12        Section 1703(a)(1) of ILSA generally identifies activities involving the statement of
13  record and the property report that are unlawful, and Section 1703(a)(2) makes certain
14  "fraudulent behavior" unlawful.  15 U.S.C. § 1703(a).  Section 1703 also provides specific
15  protections for purchasers at non-exempt projects:  Section 1703(b) gives such purchasers an
16  automatic 7-day right to revoke a contract to purchase a condominium; Section 1703(c) gives a
17  purchaser a right to revoke a purchase contract for 2 years from the date the purchase contract is
18  signed, if the purchaser is not provided a property report prior to signing the contract; and, at
19  issue here, Section 1703(d) gives a purchaser a 2-year right to revoke a purchase contract if the
20  contract does not provide: (1) a clearly identifiable lot description; (2) in the event of a
21  purchaser's default, written notice of the default and 20 days from receipt of the notice to cure
22  the default; and (3) if purchaser has paid more than 15% and such purchaser loses the right to
23  purchase the condominium, an obligation that the seller return any amount of the purchaser's
24  funds remaining after subtracting either 15% of the purchase price or the seller's actual damages,
25  whichever is greater.  15 U.S.C. § 1703(b), (c) and (d).

26

27  [5] Some projects either due to their size or their stage of completion are exempt from certain requirements of ILSA.  *See* 15 U.S.C. § 1702.  If a project qualifies for an exemption, then the developer is not required to provide any disclosures to purchasers and has no obligation to file any information about the development with HUD.
28  [6] A copy of the relevant provisions of ILSA is attached hereto as Ex. A.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Remedies for violations of Section 1703 are set forth in Section 1709—if a developer violates Section 1703(a), then a purchaser can seek relief for such violation under Section 1709(a), and if a buyer has a right to revoke under Sections 1703(b), (c) or (d), then such right is enforced pursuant to Section 1709(b).  15 U.S.C. § 1709(a) and (b).  Due to this express right to revoke, buyers of real estate during the real estate "bubble" have seized upon ILSA as an "escape hatch for regretful buyers or for buyers unable to obtain financing in a tight credit market." *Veneklase v. Bridgewater Condos, L.C.*, 2010 WL 1981424, at *2 (W.D. Mich. May 17, 2010).

No different than buyers across the country who were burned by the real estate crash, Plaintiffs have alleged various causes of action under ILSA in their Demand for alleged violations of Sections 1703(a) and 1703(c).[7]  However, pursuant to the Supplemental Stipulation Regarding Bifurcated Arbitration Hearings (the "Supplemental Stipulation"),[8] and the Second Supplemental Stipulation Regarding Bifurcated Arbitration Hearings (the "Second Supplemental Stipulation"),[9] the only ILSA-related cause of action decided by the Arbitrator in the Final Order was whether the Plaintiffs had a right to revoke their Agreements under Section 1703(d)(2) based on Trump's alleged failure to provide the contractual right to notice and an opportunity to cure for defaults.  Claims under Section 1703(a) and 1703(c) have not been fully presented or finally determined by the Arbitrator and are not the subject of the Final Order.

## B.   Factual Background

### 1.   *Trump's Compliance with ILSA*

In 2005, before entering any purchase and sale agreements with buyers, including the Plaintiffs, Trump prepared and filed with HUD a statement of record for the project known as "The Trump International Hotel & Tower—Las Vegas" ("Trump Las Vegas") including a copy of the property report for the project and the Agreement.[10]  HUD accepted the Statement of Record for the project and issued an effective date of June 16, 2005. *See* HUD acceptance letter

---

[7] Plaintiffs filed a Consolidated Demand for Arbitration on July 14, 2008 which was amended several times ending with the final Consolidated Demand filed on December 5, 2008 (as amended, the "Demand").

[8] A copy of which is attached to Plaintiffs' Motion as Ex. 19

[9] A copy of which is attached hereto as Ex. C

[10] A copy of the Statement of Record is attached hereto as Ex. D, a copy of the Property Report is attached hereto as Ex. E and an exemplar copy of the Agreement used in connection with the sales of units located in Trump Las Vegas is attached to Plaintiffs' Motion as Ex. 10.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

attached hereto as Ex. B.

The Property Report, the definitive disclosure document under ILSA, was prepared to comply with the applicable provisions of ILSA and related HUD regulations and filed with HUD in connection with the filing of the Statement of Record.  In satisfaction of HUD regulations, each Property Report had the following large type and red-lettered instructions on the front page (exact font size and color produced below):

# READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING

Property Report, Cover Page.  The Property Report included the required disclosures.  For example, in satisfaction of Section 1703(c), the cover page of the Property Report said:  "If you did not receive this Report before you signed a contract or agreement, you may cancel the contract or agreement any time within two years from the date of signing."  Property Report, Cover Page.

The Property Report included the required "notice and cure" disclosure required by Section 1703(d)(2) on page 6:

> Before we may exercise our right to cancel the Purchase Agreement, we must give you written notice of default or breach of contract and give you the opportunity to correct or cure the default or breach within twenty (20) days from the receipt of such notice.
>
> If you fail to perform any of your obligations or any of the terms of the Purchase Agreement or fail to execute and deliver any instrument required or otherwise fail to comply with any of your requirements, and if you fail to correct such default

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

within twenty (20) days after receiving notice as provided above, we may declare the Purchase Agreement terminated....

Property Report, p. 6.   In connection with the execution of an Agreement for their respective unit, every Plaintiff signed and/or initialed a Receipt, Agent Certification, and Cancellation Page Purchaser Receipt acknowledging receipt of the Property Report.

In addition to the disclosure required in the Property Report, the Agreement itself includes the disclosures required under Sections 1703(b) and (c).   *See* Agreement at ¶ 42/43 and p. 21, respectively.   The Agreement also included the contract disclosures required by Section 1703(d)(2) and (3).   *See* Agreement at ¶ 17.1/18.1.[11]

Plaintiffs' claim stems from certain limitation language in the Agreement's default section covering the right to notice and cure allegedly in violation of Section 1703(d)(2).   Paragraph 17.1/18.1 specifically provides (the alleged offending limitations appear in bold and italics):

> Buyer's Default.  Should Buyer fail to do any and all acts and execute any and all instruments necessary on the designated Closing Date or should Buyer fail to perform any covenant, promise or obligation required to be performed hereunder, Seller, at its option, may terminate this Agreement and retain, or if not then paid by Buyer, Buyer will pay to Seller, all of Buyer's deposits then made or which would have been made or required had Buyer not defaulted, and all interest which was, or would have been, earned on such deposits, as liquidated and agreed upon damages (the "**Liquidated Damages Amount**"); the parties hereto agree and acknowledge that actual damages resulting from a default or breach by Buyer are extremely difficult to estimate and that the Liquidated Damages Amount is a reasonable, good faith estimate of the actual damages incurred by Seller in connection with the removal of the Unit from the market and shall not constitute a penalty.  Upon payment or retention of the Liquidated Damages Amount, all parties hereto shall be released from obligations hereunder.  Notwithstanding the foregoing, and *with the exception of Buyer's failure to timely pay a deposit or close on the Closing date*, Seller shall give Buyer written notice of Buyer's default or breach of this Agreement and give Buyer the opportunity to correct the default or breach within twenty (20) days from the receipt of such notice.  The Escrow Agent, upon being notified of Buyer's failure to correct the default or breach, shall pay Buyer's deposits and interest thereon to Seller and the Escrow Agent shall be under no obligation to make any independent investigation or confirmation of the alleged default.  *In the event that Buyer fails to timely pay a deposit or close on the Closing Date, Seller shall have the option of terminating this Agreement without prior notice to Buyer.*

Agreement at ¶ 17.1/18.1 (emphasis added).

___

[11] In preparing the form agreement, there was a typographical error that inserted a misplaced paragraph number (Paragraph 2) into some of the agreements thereby causing every subsequent paragraph to be increased by one. Accordingly, the numbering of the paragraphs of the Plaintiffs' Agreements varies.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

With respect to the above limitations, Trump asserted that the limiting language, which was not included in the Property Report disclosure, was mistakenly included from a prior draft agreement. After hearing extensive evidence on the issue, the Arbitrator found that "the evidence made it clear that such limitations were not in the Agreements to circumvent ILSA or to intentionally withhold the § 1703(d) rights from [Plaintiffs]." *See* Final Order, p. 11:24-26. Notwithstanding the contractual language and consistent with the relevant disclosure in the Property Report, the arbitrator found (and Plaintiffs did not contest) that Trump provided written notice for all defaults, including monetary defaults, and the opportunity to cure such defaults.[12] In many cases Trump provided longer than 20 days for buyers to cure their defaults.[13]

### 2. *Plaintiffs' Remorse*

In 2004 the Las Vegas real estate market was flourishing. During this time many developers, including Trump, announced their plans to construct high-rise projects like the Cosmopolitan, MGM's City Center and Palms Place. Encouraged by the appreciating market, the Plaintiffs entered into purchase agreements for units located in the yet-to-be constructed Trump Las Vegas. The Plaintiffs entered their respective Agreements at various times commencing in May 2005 through June 2007. As required by the Agreements, many of the Plaintiffs paid deposits at the time they entered their Agreements and 12 months thereafter. *See* Agreements at ¶ 1/2. If a buyer did not timely pay a deposit, Trump would notify, in writing, the buyer and give the buyer time to pay the deposit—oftentimes much longer than 20 days to do so.

In 2007, the Las Vegas real estate market started to cool. At the end of 2007 and in the spring of 2008, Trump provided notices that construction of Trump Las Vegas was nearing completion and that the Plaintiffs should prepare to close on their units. By the time Trump

---

[12] Examples of Trump's twenty-day notice letters are attached hereto as Ex. F ("20-day Notice Letters"), if the Court desires to see all of the twenty-day notice letters, then Trump can provide such letters—Trump provided the Arbitrator with approximately 400 pages consisting of the twenty-day notice letters; *see also*, the Final Order, pp. 11-12 ("Notwithstanding the absence of the contractual obligation to do so … [Trump] always gave written notice of defaults and the opportunity to cure such defaults. Based on this behavior (which was consistent with § 1703(d)(2)), the Arbitrator finds that [Trump] intended to comply with § 1703(d) and any noncompliance arising from the limitations language in the Agreements was inadvertent.").

[13] Examples of notices by which Trump extended Plaintiffs' time to cure a default, which extensions ranged in time from one 30-day extension, to five consecutive 30-day extensions, are attached hereto as Ex. G, if the Court desires to see all of the extension letters, approximately 175 pages, provided to the Arbitrator, then Trump will provide.

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

provided notice to Plaintiffs of their actual closing dates, the bursting of the Las Vegas real estate bubble was *fait accompli*.  As a result, many buyers, including the Plaintiffs, could not or would not close on the purchase of their units.[14]

## C.   Procedural Background

### 1.   The Demand

Unable or unwilling to close on the purchase of their units in Trump Las Vegas in a bursting market, Plaintiffs filed the Demand.  For most of the Plaintiffs, including those who were added after the original filing date, the Demand was filed outside of the 2-year revocation period provided by Section 1703(d).[15]

### 2.   The Arbitrator's First Ruling

Simultaneously on March 30, 2009, Plaintiffs filed with the Arbitrator a motion to enforce their right of revocation under Section 1703(d)[16] and, Trump filed a request for dismissal of Plaintiffs' claims under Section 1703(d).[17]   After the parties had filed the appropriate responses to each other's requests and replies in support of their own requests,[18] the Arbitrator held a hearing on June 6, 2009.  Based on his due consideration of the "exhaustive pleadings, motions, briefs, exhibits, citations and correspondence of the parties relative to the several dispositive motions" including the oral argument presented at the hearing, the Arbitrator issued

---

[14] The Eleventh Circuit Court of Appeals succinctly described this phenomenon:

> In a market-based economy the price of housing, like other goods, is subject to swings. There was a sharp upward swing in housing prices between late 2000 and the end of 2005, and the resulting bubble was bigger in Florida than it was in most other states. Home prices there rose eighty-two percent in absolute terms during that short period, outstripping the fifty-one percent national increase.  All bubbles eventually burst, as this one did. The bigger the bubble, the bigger the pop. The bigger the pop, the bigger the losses. And the bigger the losses, the more likely litigation will ensue. Hence this case.

*Stein*, 586 F.3d at 852 (citation omitted) (exemption).

[15] Based on the Arbitrator's finding, which has not been challenged, "that a buyer must revoke within two years of the date such buyer signs a purchase agreement subject to ILSA," *see* Final Order, p. 25:26-27, Trump believes that there are only 51 Plaintiffs that gave notice of their intent to revoke within the 2-year revocation period.

[16] *See* March 2009 Motion to Enforce Right of Revocation Under 15 U.S.C. § 1703(d), attached hereto as Ex. I ("Plaintiffs' March 2009 Motion")

[17] *See* Request for Summary Disposition of Certain Claims, attached hereto as Ex. J.

[18] *See* Claimants' Response to Respondent's Request for Summary Disposition of Certain Claims submitted April 20, 2009 and Claimants' Reply in Further Support of Their Dispositive Motions submitted May 15, 2009 and Respondent's Response to Claimants' Dispositive Motions submitted April 20, 2009 and Respondent's Reply in Support of Request for Summary Disposition of Certain Claims submitted May 15, 2009, attached hereto as Ex. K.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

an order denying Plaintiffs' request to enforce a right of revocation under ILSA.  *See* Omnibus Rulings of Dispositive Motions dated July 15, 2009, p. 1 (the "2009 Order") attached as Ex. H.

In denying Plaintiffs' request to revoke, the Arbitrator entered the following findings: "(a) [Trump] substantially complied with ILSA; (b) ILSA is not a strict liability statute; (c) the 'savings clause' contained within [Plaintiffs'] purchase agreements effectively cured any inadvertent defects in [Trump's] compliance with ILSA; and (d) the underlying purchase agreements are not illusory." *See* 2009 Order at ¶ 1.  As would be the case with the Final Order, the Arbitrator considered whether a severability/savings clause contained in the Agreement was enforceable to cure the limitations on the right to written notice and an opportunity to cure.  The relevant provision is found in paragraph 24.6/25.6 of the Agreement (the "Savings Clause"):

> Construction.  It is Seller's and Buyer's mutual desire and intention that all provisions of the Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement in its entirety unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety, and then are to be enforced as so modified.  *If the unenforceable part or parts cannot be so modified, such part or parts shall be unenforceable and considered null and void in order that the mutual paramount goal that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms can be achieved.*
>
> *Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights, remedies and powers, or waiving or limiting any of Buyer's rights, remedies or powers or Seller's obligations, results in a final determination (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposit, such offending rights, powers, limitations and/or waivers shall be struck, cancelled and rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement, unless the specific purpose of that language is to grant a right of cancellation.*

Agreement at ¶ 24.6/25.6 (emphasis added).  Just like in the Final Order, the Arbitrator found that the Savings Clause was enforceable and operated to remove the limitations on a buyer's right to written notice of default and the opportunity to cure.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

In making these findings, the Arbitrator clarified that the denial was without prejudice but did so on a limited basis; specifically, the 2009 Order provided that "[t]he parties may reassert their requests for summary disposition of specific issues at a more appropriate time, after sufficient discovery, and *upon a proper evidentiary showing for the relief requested.*" *See* 2009 Order at ¶ 13 (emphasis added). Accordingly, the parties were granted the right to conduct discovery. Specifically, Plaintiffs were seeking to determine whether inclusion of the limitations language in paragraph 17.1/18.1 of the Agreement was intentional and whether Trump substantially complied with Section 1703(d).[19]

From the time of the 2009 Order, Plaintiffs consistently embraced the conclusion that only factual issues remained in dispute and never suggested that the legal conclusions of the 2009 Order needed to be reconsidered. From an August 3, 2009 letter to the Arbitrator:

> Assuming that [Plaintiffs] are correct that paragraph 13 of [the 2009 Order] allows for discovery with respect to [Plaintiffs'] Section 1703(d) claim, [Plaintiffs] respectfully request that they be authorized to immediately begin discovery regarding: (a) Trump's actions that it contends constitute substantial compliance with Section 1703(d); and (b) the alleged "scrivener's error." Such discovery is necessary because there are currently no facts established upon which you can base a final decision on these issues.... Accordingly, the alleged error is an issue that requires discovery since the equitable doctrine of substantial compliance is applicable, if at all, only if Trump's statutory noncompliance with Section 1703(d) was unintentional and the savings clause is likewise applicable only if the noncompliance was unintentional.

Letter from Mr. Easterlin, Counsel for Plaintiffs, to Harold Coleman, Jr., Arbitrator (August 3, 2009) (attached as Ex. L). As a result of the Arbitrator's subsequent order, Plaintiffs were allowed to conduct extensive discovery, including the depositions of Trump's lawyers (with a full waiver of the privilege) to identify facts confirming their assertion that the limitations were intentional and designed to circumvent ILSA.

---

[19] *See* Letter from Mr. Easterlin, Counsel for Plaintiffs, to Harold Coleman, Jr., Arbitrator (July 16, 2009), attached hereto as Ex. N ("We understand the intent of [Paragraph 13 of the 2009 Order] to mean that [Plaintiffs] are entitled to pursue discovery regarding whether Trump's conduct was in substantial compliance with 15 U.S.C. § 1703(d) and whether the defect in the Agreements was inadvertent.")

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

### 3.     The Arbitrator's Second Ruling

From the time the Demand was filed, Trump consistently contended that most of the Plaintiffs' causes of action were individualized in nature such that the claims should be severed. Notwithstanding this belief, Trump, in the interest of efficiency, agreed to bifurcate certain claims in a manner that would permit the Arbitrator to hold a hearing on certain issues of fact common to all of the Plaintiffs, which included Plaintiffs' claims under Section 1703(d).  *See* Stipulation Regarding Bifurcated Arbitration Hearings attached hereto as Ex. M (the "Stipulation").  Due to a procedural dispute between the parties,[20] the hearing contemplated by the Stipulation was not held.

The parties then entered into the Supplemental Stipulation which contemplated the Arbitrator's consideration of whether the Agreement "actually or substantially complied" with Section 1703(d)(2).  In contrast with the 2009 Order, the Arbitrator would not consider the Savings Clause in measuring the Agreement's actual or substantial compliance with Section 1703(d).  In the event that Trump prevailed, the Plaintiffs' claims under Section 1703(d)(2) would be dismissed with prejudice.  On the other hand, if the Plaintiffs prevailed then a second evidentiary hearing would be held to determine whether the facts supported the application of the Savings Clause consistent with the 2009 Order.[21]  Pursuant to the Supplemental Stipulation, Trump and the Plaintiffs simultaneously submitted briefs on whether the Agreement complied with Section 1703(d) irrespective of the applicability of the Savings Clause.[22]

---

[20] On the eve of the hearing, Plaintiffs provided individual declarations for each Plaintiff.  As a result, Trump contended that the submission of declarations for each Plaintiff was in violation of the parties ' agreement and fundamentally unfair where Trump was only permitted to depose 10 Plaintiffs prior to such submission.

[21] In Plaintiffs' Motion, Plaintiffs misleadingly imply that a finding for the [Plaintiffs] as a result of the March 12, 2010 "shall be *final* as to such Agreements" by quoting only a portion of the Supplemental Stipulation.  *See* Plaintiffs' Motion, p. 8:18 (emphasis original).  The full text of the Supplemental Stipulation makes clear that the parties never contemplated that such a ruling would be final without an evidentiary hearing.  Specifically, the relevant portion of the Supplemental Stipulation says in its entirety: "If the Arbitrator decides the Threshold Issue in [Plaintiffs'] favor as to some or all of the Agreements, that ruling shall be final as to such Agreements, *subject to a hearing as more particularly set forth in Paragraph 3 above.*"  *See* Supplemental Stipulation at ¶ 5 (emphasis added).  The omission of the italicized language, especially without the appropriate use of ellipses is materially misleading.

[22] *See* Plaintiffs' motions (Claimants' Motion to Enforce a Two-Year Right of Rescission Pursuant to 15 U.S.C. § 1703(d) dated February 1, 2010 ("Plaintiffs' February 2010 Motion") and Claimants' Response to Respondent's Motion for Summary Disposition of Claimants' Claims Under 15 U.S.C. § 1703(d)), attached to Plaintiffs' Motion as as Exs. 24 and 25 and Trump's motions (Respondent's Motion for Summary Disposition of Claimant's Claims

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

After considering the written submissions and the parties' arguments made at a day-long live hearing conducted on March 12, 2010, the Arbitrator found that Trump "did not fully comply with the requirements of [Section 1703(d)(2)] by its insertion of 'exceptions' into the contract language." *See* Rulings re Claimants' 15 U.S.C. § 1703(d)(2) Right of Revocation Claim ("April 2010 Order") at ¶ 2, attached to Plaintiffs' Motion as Ex. 20. Consistent with the Supplemental Stipulation, the Arbitrator did not consider "any legal effect of the savings clause in reaching [his] ruling," but acknowledged that "it [would] be given due consideration at the appropriate time." *Id.* at ¶ 6. In testing Trump's full compliance with the express terms of Section 1703(d)(2), the Arbitrator held that a review of the legislative history for Section 1703(d)(2) would avail little. *Id.* at ¶ 3.

With respect to whether Trump substantially complied with Section 1703(d)(2), the Arbitrator did not make a finding. "It is less clear as to whether [Trump], by its actions, substantially complied with the statute. Indeed, the parties submitted extensive briefing on the issue of whether a demonstration of substantial compliance is sufficient to comply with the statute." *Id.* at ¶ 4 (emphasis original). The Arbitrator commented further that: "Each [party] furnished legal authority to support its position; however, the authorities posited fall short of resolving the issue, in the mind of this arbitrator, as to whether substantial compliance is in fact an appropriate legal standard in determining compliance for § 1703(d)(2) 'right of revocation' purposes." *Id.* The Arbitrator further confirmed that he would consider additional argument regarding substantial compliance:

> In this vein, the arbitrator reserves discretion, pursuant to rule R-31(a) of the Commercial Rules, to further consider [Trump's] substantial compliance defense at such time that he receives evidence and argument on the savings clause and equitable-tolling defenses.

*See* April 2010 Order at ¶ 7.[23]

---

Under 15 U.S.C. § 1703(d) and Respondent's Response to Claimants' Motion to Enforce a Two-Year Right of Rescission Pursuant to 15 U.S.C. § 1703(d)), attached hereto as Ex. O.

[23] In response to the April 2010 Order, Plaintiffs never informed the Arbitrator their belief, which is for the first time expressed in the Plaintiffs' Motion, that the "Arbitrator abrogated his responsibility under the Stipulation to rule on the substantial compliance issue." *See* Plaintiffs' Motion, p. 9:4-5.

#### 4. *The Arbitrator's Final Ruling*

In view of the April 2010 Order, the parties entered into the Second Supplemental Stipulation to identify the claims and issues to be addressed in briefs submitted by the parties to the Arbitrator and to be presented at an evidentiary hearing. With respect to the Plaintiffs' claims under Section 1703(d)(2), the Second Supplemental Stipulation contemplated that the following issues would be considered by the Arbitrator: (a) application of the savings clause, (b) whether substantial compliance is an appropriate legal standard and whether Trump's conduct constituted substantial compliance,[24] (c) which Plaintiffs timely exercised a right to revoke, if any such right existed, within 2 years of signing, (d) whether the 2-year revocation period could be equitably tolled and (e) whether Plaintiffs qualified for the application of equitable tolling. *See* Second Supplemental Stipulation, ¶¶ 2 and 3.

In accordance with the Second Supplemental Stipulation, the parties submitted briefs to the Arbitrator on May 27, 2010[25] and participated in a 5-day hearing from July 19 until July 24, 2010 in which they presented evidence and law related to the Plaintiffs' claims under Section 1703(d)(2). The Arbitrator took 60 days to consider the raft of evidence and argument adduced at the July hearing and entered the Final Order on November 1, 2010.

Plaintiffs' erroneously claim that, under Rule 46 of the Commercial Rules of the American Arbitration Association and the doctrine of *functus officio,* "the Arbitrator had no authority to revisit … his earlier decisions contained in the [April 2010 Order]." *See* Plaintiffs' Motion, p. 9:18-19. The record does not support this position.[26] The Arbitrator did not revisit any of his earlier decisions in the April 2010 Order. As described above, the April 2010 Order resolved that Trump did not "fully" comply with Section 1703(d)(2), but it expressly reserved the application of the Savings Clause and the equitable doctrine of substantial compliance. He did

---

[24] Despite the language of the April 2010 Order, Plaintiffs were recalcitrant in contending that the April 2010 Order finally decided the issue of substantial compliance in their favor. *See* Second Supplemental Stipulation at ¶ 3.

[25] Plaintiffs filed two briefs: Claimants' Motion to Enforce a Two-Year Right of Rescission Pursuant to 15 U.S.C. § 1703(d) Notwithstanding the Savings Clause (attached to Plaintiffs' Motion as Ex. 28 ) and Claimants' Motion for a Ruling that Rescission of the Agreements pursuant to 15 U.S.C. § 1703(d) is Not Time-Barred ("Plaintiffs' Timely Revocation Motion"), which is attached hereto as Ex. P. Trump's brief (Respondent's Request for Final Dismissal of Claimants' Claims Under 15 U.S.C. § 1703(d)) is attached hereto as Ex. Q.

[26] In discussing Rule 46 and the doctrine of *functus officio,* Plaintiffs failed to mention the Arbitrator's 2009 Order that addressed the exact same legal issues presented to the Arbitrator in connection with the Final Order.

- 16 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

not revisit this decision in the Final Order.   In fact, he expressly confirmed it: "Absent application of the savings clause, the Agreements did not comply with § 1703(d)(2) because [Plaintiffs'] rights to written notice of and the opportunity to cure monetary defaults was limited by the language of the Agreements." *See* Final Order, p. 11:21-23.  The Final Order, however, also considered the effect of the Savings Clause on Trump's compliance and determined that substantial compliance was an appropriate standard and that Trump's conduct satisfied it—issues not resolved in the April 2010 Order.

## IV.  ARGUMENT

As noted above, the arbitration presented a novel issue -- whether a limitation on Plaintiffs' right to written notice of default and the opportunity to cure violated Section 1703(d) such that Plaintiffs had a two year right to revoke even though: (1) Trump registered Trump Las Vegas with HUD in compliance with ILSA; (2) the Property Report disclosed the Plaintiffs' right to written notice of default and the opportunity to cure such default without limitation; (3) Trump did not intentionally seek to limit Plaintiffs' right to written notice of defaults and the opportunity to cure such defaults; (4) the Savings Clause required the Arbitrator to strike, cancel and render unenforceable any language granting to Trump rights, remedies or powers or that waived or limited any of Plaintiffs' rights, remedies or powers where such language would allow the Plaintiffs to cancel the Agreement and receive a refund of their deposits; and (5) Trump, as required by Section 1703(d)(2), gave Plaintiffs, without exception, written notice of every default and the opportunity to cure such defaults for 20 days (and in most cases much longer).

There are no reported decisions, within or outside the Ninth Circuit, where a court has considered the foregoing issues in their entirety.[27]  In fact, there are only 3 reported decisions in any jurisdiction where courts considered alleged violations of Section 1703(d)(2)—and none of these decisions enforced a right to revoke, considered the applicability of a "savings clause" or evaluated whether Section 1703(d) was subject to substantial compliance.[28]  Accordingly, every

---

[27] *See* Final Order, p. 6:24-26 ("[T]hese issues are issues of first impression that have not been addressed by federal courts in the Ninth Circuit or Nevada courts.").

[28] *See* Infinity Global, LLC v. Resort at Singer Island, Inc., 2008 WL 1711535 (S.D. Fla. Apr. 10, 2008); Stefan v. Singer Island Condominiums Ltd., 2009 WL 426291 (S.D. Fla. Feb. 20, 2009) ("*Stefan I*"); Stefan v. Singer Island Condominiums Ltd., 2009 WL 1515529 (S.D. Fla. May 28, 2009) ("*Stefan II*").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    other case presented to the Arbitrator alleged violations of other sections of ILSA (most

2    commonly involving projects not registered with HUD) or did not involve ILSA claims at all.

3    As made obvious by the procedural history of this case, there can be no question that the

4    Arbitrator went to painstaking lengths to ensure that the parties, especially the Plaintiffs, were

5    given a full and fair opportunity to be heard on the issues before him.  In fact, the Arbitrator

6    expressly acknowledged resolving all "close calls" in favor of the Plaintiffs to ensure that they

7    "may be afforded adequate due process in presenting their claims."  *See* April 2010 Order at ¶ 5.

8    Similarly, as made obvious by a review of the Final Order, the Arbitrator deeply considered and

9    addressed the legal theories and arguments raised by the parties.  In light of the standard—

10   manifest disregard of the law—for this court to vacate the Arbitrator's findings, the careful

11   consideration reflected in the Final Order sufficiently demonstrates that the Arbitrator did not

12   manifestly disregard the law.  In fact, a review of the relevant law proves that the Arbitrator

13   correctly held that Plaintiffs had no right to revoke because (1) the Savings Clause applies to

14   cure the alleged violation of Section 1703(d) and (2) Trump substantially complied with ILSA.

15   **A.       The Savings Clause Applies to Cure Any Violation of Section 1703(d)**

16   The Plaintiffs principally contend that the Arbitrator manifestly disregarded the law by

17   enforcing the Savings Clause because (1) the Savings Clause cannot apply at the time the

18   Plaintiffs signed the Agreements to cure noncompliance; (2) the express terms of the Savings

19   Clause do not operate to remove the limitations on the Plaintiffs' right to written notice of

20   defaults and opportunity to cure; (3) the Arbitrator manifestly disregarded relevant ILSA case

21   law finding "savings clauses" unenforceable; (4) the Arbitrator manifestly disregarded

22   "analogous authority" involving usury provisions; and (5) the Arbitrator improperly considered

23   Trump's compliance with ILSA in determining the enforceability of the Savings Clause.  *See*

24   Plaintiffs' Motion, pp. 20:14-26 through 26:1-9.

25   None of the Plaintiffs' contentions or cited authority contradicts the following findings of

26   the Arbitrator: (1) Nevada law governs interpretation and enforcement of the Agreements

27   including the enforcement of the Savings Clause, *see* Final Order, p. 13:8-18; (2) Nevada law

28   favors construing contracts to render them enforceable, to enforce them as written and to enforce

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

the intentions of the parties including to enforce so-called "savings clauses," *see* Final Order, pp. 13:18-23, 14:16-28 and 15:1-4; and (3) "under Nevada law contract language that could violate a statute and subject the contract to rescission, contrary to the parties' intentions expressed in the contract, should be severed from the contract," *see* Final Order, p. 15:6-8. Plaintiffs' failure to identify the controlling law manifestly disregarded by the Arbitrator in entering the foregoing findings is fatal to this Motion. Of course, Plaintiffs' failure is not surprising because the Arbitrator's findings are correct and embrace well-recognized principles of contract interpretation under applicable law. Although Plaintiffs offer only "collateral" attacks to the Arbitrator's findings, each of their alleged evidences of manifest disregard is addressed below.

**1.    *The Savings Clause Cures Noncompliance at the Time the Agreements Were Signed***

Without citing any direct legal authority, Plaintiffs contend that the Savings Clause cannot operate to cure the Agreements' noncompliance with Section 1703(d)(2) at the time the Agreements were signed. Under the Plaintiffs' understanding of the applicability of savings clauses, such clauses would never be effective because the violations they seek to cure incurably occur in the past. However, as explained by the First Circuit Court of Appeals, "[a] 'savings clause' *preemptively* resolves conflicts between contract language and applicable law...." *Kristian v. Comcast Corp.*, 446 F.3d 25, 57 n.16 (1st Cir. 2006). Enforcing a savings clause to cure noncompliance in the ILSA context is supported by the court's reasoning in *Dubois v. Home Dynamics Murano, LLC*, Case No. 07-61082-CIV-LENARD/GARBER (S.D. Fla. June 17, 2008) (a copy of *Dubois* is attached as Ex. R).

The court's analysis in *Dubois* is especially instructive with respect to the applicability of a savings clause to a purchase agreement that would otherwise be revocable under Section 1703(c) and 1703(d). *See id.* at pp. 5-9. Like Plaintiffs here, the purchaser in *Dubois* sought to revoke his agreement under Section 1703(d) of ILSA because it did not include the provisions set forth in Section 1703(d). *Id.* at 3. But unlike this case, the developer sought relief from ILSA's disclosure requirements under the "Improved Lot Exemption" under Section 1702(d)(2), which requires a developer to be obligated to build the unit being sold within 2 years from the

date the purchaser signs the purchase agreement. Accordingly, the purchaser argued that the agreement did not qualify for an exemption under ILSA because it restricted the purchaser's remedy to specific performance, contrary to Florida law interpreting ILSA. *Id.*

The *Dubois* court found that, by looking at the contract as a whole, the severability clause applied to preserve the ILSA exemption and to preclude the purchaser's right to revoke under Section 1703(d). *Id.* at 7. "As set forth in the severability clause, the Contract between Plaintiff and Defendant was specifically intended to be divisible if one of the provisions runs contrary to § 1702(a)'s ILSA exemption." *Id.* The court severed the limitations on damages clause (and any impermissible reasons extending the 2-year obligation to complete construction) finding that such clause (and offending language) could be severed "without destroying the primary purpose of the agreement," which was the sale of the lot. *Id.*; *accord Vincent v. Santa Cruz*, 647 P.2d 379, 381 (Nev. 1982) (severing illegal provision to uphold the valid sale agreement).

Importantly, the court's application of the savings clause rendered the purchase agreement non-revocable under ILSA *as of the date the purchase agreement was signed* despite the fact that the purchase agreement, without application of the savings clause, did not comply with ILSA *at the time it was signed.*

### 2. The Express Terms of the Savings Clause Operate to Remove the Limitations on the Plaintiffs' Right to Written Notice of Defaults and Opportunity to Cure

The basic premise of the Plaintiffs' claims under Section 1703(d)(2) is that the Agreements limit their rights to written notice of defaults and the opportunity to cure such defaults, thereby giving them the right to cancel such Agreements. However, the last sentence of the Savings Clause makes clear that: "Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement, unless the specific purpose of that language is to grant a right of cancellation." Agreement at ¶ 24.6/25.6.

As found by the Arbitrator, Nevada law requires the Arbitrator to enforce the intentions of the parties in construing a contract. *See* Final Order, p. 14:18-19. The last sentence of the Savings Clause unambiguously states the intentions of the parties that the Agreements be

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

enforceable.  Not only does the Savings Clause give clear instructions as to the parties' intent, it also empowered the Arbitrator to exercise the following powers to preserve the enforceability of the Agreements: (1) modify any part or parts of the Agreement that "would render other parts of [the] Agreement or [the] Agreement in its entirety unenforceable" and to enforce the Agreement as so modified; (2) consider null and void any such part or parts of the Agreement; or (3) strike, cancel or render unenforceable, ineffective and null and void any "language granting to Seller certain rights, remedies and powers, or waiving or limiting any of Buyer's rights, remedies or power" if such language results in a final determination that would give the buyer the right to cancel the Agreement and receive a refund of the buyer's deposits.  *See* Agreement at ¶ 24.6/25.6.

Although it is not clear from Plaintiffs' Motion what law the Arbitrator manifestly disregarded in exercising his powers under the Savings Clause, the Plaintiffs appear to claim that the Savings Clause doesn't work because there was no "final determination."  *See* Plaintiffs' Motion, p. 22:7-12.  This contention overlooks the fact that the Arbitrator was authorized, as discussed above, to modify or consider null and void any parts of the Agreement that would render the Agreement in its entirety unenforceable without reference to a "final determination." *See* Agreement at ¶ 24.6/25.6.  Even assuming a "final determination" is necessary before the Arbitrator could exercise the powers vested in him by the Savings Clause, such determination was made in the April 2010 Order when the Arbitrator found, without giving effect to the Savings Clause, that Plaintiffs "may proceed with their presentation of a two-year right of rescission under the statute, it being demonstrated to the satisfaction of the arbitrator that [Trump] did not fully comply with said statute...."  April 2010 Order at ¶ 7.  Plaintiffs imply that the Arbitrator is not authorized to exercise his power to modify the Agreements as contemplated by the Savings Clause until such time he entered a finding for the Plaintiffs and permitted them to cancel the Agreements.  Such an interpretation of the Savings Clause would be absurd.

### 3.   Consideration of the *Harvey* and *Kabula* Cases

To support their assertion that the Arbitrator manifestly disregarded the law, Plaintiffs cite to two reported decisions in which the courts refused to apply "savings clauses"—*Harvey v. Lake Buena Vista Resort, LLC*, 568 F. Supp. 2d 1354 (M.D. Fla. 2008) and *Kabula v. S. Homes of Homestead VIII, Inc.*, 2008 WL 2741154 (S.D. Fla. July 14, 2008). Far from manifestly disregarding the law set forth in *Harvey* and *Kabula*, the Arbitrator considered these cases and articulated his reasons for not following them. *See* Final Order, pp. 16:13-28 and 17:1-7. Each of the reasons articulated by the Arbitrator would be a rational basis for not relying on *Harvey* and/or *Kabula*.

First, these cases are decided under Florida law, which differs materially from Nevada law. *See* Final Order, p. 16:16. As described above and found by the Arbitrator, which finding has not been challenged by the Plaintiffs, and as confirmed by the courts' reliance on Florida law in *Harvey* and *Kabula*, Nevada law governs application of the Savings Clause.

Second, in contrast with the Savings Clause in this case, the "savings clauses" at issue in *Harvey* and *Kabula* did not empower the courts to cure the non-compliance of the underlying agreements. In *Harvey*, the "savings clause" merely provided: "It is the intention of the parties that this sale and purchase shall qualify for the exceptions provided by 15 U.S.C. § 1702(a)(2), and nothing shall be construed or operate, as to any obligations of Seller or Buyer, in a manner which would render the exemption inapplicable." *Harvey*, 568 F. Supp. 2d at 1364-65. The clause provided no authority to the court to sever any provisions that caused the agreement not to qualify for the exemptions set forth in Section 1702(a)(2). In *Kabula*, the savings clause simply provided that: "any contractual provision conflicting with the [ILSA] is void." *Kabula*, 2008 WL 2741154, at *1.

In declining to enforce the "savings clause" the court in *Harvey* specifically found that "[t]he savings clause in this case is no more than the Resort developer's attempt to provide itself with an 'escape hatch' in order to take advantage of the [ILSA] exemption down the road, despite its failure to draft a Purchase Agreement that actually complied with the [ILSA] in the first instance." *Harvey*, 568 F. Supp. 2d at 1365. Post-*Harvey*, many Florida courts, when asked

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

1   to consider the applicability of savings clauses, entered findings that savings/severability clauses

2   were enforceable even though their determinations did not rely on the enforceability of such

3   savings/severability clauses in an apparent effort to distance themselves from the *Harvey*

4   decision.[29]

5       Based on a review of the courts' holdings described above, the Arbitrator appropriately

6   found that "most cases decided since *Harvey* (cases applying Florida law) have not found

7   'savings clauses' unenforceable or condemned them as 'escape hatches' intended to avoid

8   compliance with ILSA." Final Order, p. 16:23-25. These courts' holdings, whether dicta or not,

9   are significant because they are given in a context where exemptions are to be "narrowly

10  construed." *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 105 (3d Cir. 1990) (explaining

11  that "exemptions from remedial statutes such as [ILSA] are to be narrowly construed.").

### 4.   It is Not Manifest Disregard to Reject Analogous Cases from Foreign Jurisdictions

12  
13  

14      Paragraph 20/21 of the Agreements says: "The Agreement shall be governed by and

15  construed in accordance with the laws of the State of Nevada." In light of this clear mandate to

16  the Arbitrator to construe the Agreements in accordance with the laws of the state of Nevada, it

17  is difficult to comprehend how the Arbitrator's rejection of "analogous authority" from foreign

18  jurisdictions, no matter how overwhelming, supports any assertion that the Arbitrator manifestly

19  disregarded the law. To the contrary, it would be more justified to conclude that the Arbitrator's

20  reliance on such authority without reference to Nevada law constitutes manifest disregard.

21  [29] *See, e.g.,* Pilato v. The Edge Investors, L.P., 609 F. Supp. 2d 1301, 1309 (S.D. Fla. 2009) ("[T]he Contract
22  included a severability clause, which indicates the parties' intent that the ILSA exemption apply. Severability
    clauses are recognized and enforceable under Florida law. Here, the language contained in the 'severability clause'
23  portion of the Contract does not constitute an impermissible waiver, nor does it reveal an intent solely to evade
    ILSA's disclosure requirements.") (internal citations omitted); Rosenstein v. The Edge Investors, L.P., 2009 WL
24  903806, at *8 (S.D. Fla. March 30, 2009)(same court as Pilato deciding and reiterating the reasoning of Pilato);
    Pellegrino v. Koeckritz Development of Boca Raton, LLC, 2008 WL 6128748, at *4 (S.D. Fla. July 10, 2008)
25  ("Moreover, the severability clause in the Purchase Agreement supports this conclusion. That language makes void
    any language in the Purchase Agreement that restricts the obligation to build within two years.... Clearly, then, the
26  intent of this Purchase Agreement was, above all else, to ensure that the two-year exemption in ILSA endures.");
    Caswell v. Antilles Vero Beach, LLC, 2008 WL 4279555, at *4 (S.D. Fla. July 8, 2008) ("Further, the Contract
27  included a severability clause, which indicates the parties' intent that the ILSA exemption apply. Severability
    clauses are recognized and enforceable under Florida law.... Further, the language contained in the 'severability
28  clause' portion of the Contract does not constitute an impermissible waiver, nor does it reveal an intent solely to
    evade ILSA's disclosure requirements.") (internal citations omitted).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

### 5. *Trump's Compliance with Other Provisions of ILSA is Relevant*

In rejecting the application of a savings clause, the *Harvey* court relied on its determination that application of the savings clause would "undermine public policy." *Harvey*, 568 F. Supp. 2d at 1365. The *Harvey* court did not identify the exact public policy concerns it was seeking to resolve. Despite such omission, it is reasonable to assume that the court was concerned with expanding the exemptions such that no developer would be obligated to register a project with HUD, regardless of its size or state of completion, or to provide buyers with the required disclosures. Due to Trump's efforts to comply with ILSA through registration and providing the required disclosures, the Arbitrator was merely observing that such public policy concerns were not implicated in this case.

As mentioned above, Plaintiffs have not provided any direct authority that contradicts the Arbitrator's findings with respect to the enforceability of the Savings Clause. The omission is not an oversight. No such authority exists. Absent this authority and evidence that the Arbitrator manifestly disregarded such authority, Plaintiffs motion to vacate the Final Order must be dismissed.

### B. Trump Substantially Complied with ILSA

Under Nevada law, "a substantial compliance standard generally applies to statutory requirements." *Las Vegas Convention & Visitors Auth. v. Miller*, 191 P.3d 1138, 1146 (Nev. 2008) [hereinafter *LVCVA*]. Accordingly, the Arbitrator's consideration of substantial compliance demonstrates his regard for the law, instead of, as claimed by the Plaintiffs, providing evidence of "how deeply flawed" his finding was. *See* Plaintiffs' Motion, p. 26:31. As discussed below, the Arbitrator's finding that "ILSA can be satisfied through substantial compliance" is supported by Nevada law, cases interpreting ILSA and the Agreements themselves. Final Order, p. 18:10. Furthermore, his finding that Trump "substantially complied with ILSA" is supported by the facts. *Id.* at p. 18:11.

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

### 1.   Nevada Law Supports Finding that ILSA Can Be Satisfied Through Substantial Compliance

Substantial compliance is permitted to allow a party, notwithstanding such party's failure to perfectly comply with a statute, to be deemed to satisfy a statute's requirements so long as the reasonable objectives of the statute are met. *See, e.g.*, *Williams v. Clark County Dist. Atty.*, 50 P.3d 536, 541 (Nev. 2002) (finding substantial compliance even though required information was provided 6 days late because the statute's objective was met by the late filing even though the statutory requirements were not met). Substantial compliance is defined as "compliance with essential matters necessary to ensure that every reasonable objective of the statute is met." *Id.* (citing *Orr v. Heiman*, 12 P.3d 387, 389 (Kan. 2000); *Rogers v. Roberts*, 717 P.2d 620, 622 (Ore. 1986); *Baker v. Atkinson*, 625 N.W.2d 265, 272 (S.D. 2001). Accordingly, "[g]enerally, in determining whether strict or substantial compliance is required, courts examine the statute's provisions, as well as policy and equity considerations." *Leven v. Frey*, 168 P.3d 712, 717 (Nev. 2007). These considerations may also include a review of legislative history to identify a statute's "essential matters" or "reasonable purposes." *See LVCVA*, 191 P.3d at 1149 (reviewing the legislative history for NRS 295.0575 to determine whether its objectives were met).

With this clear mandate from Nevada courts, the Arbitrator understandably turned to the legislative history to understand the intent and purpose of Congress in adding Section 1703(d) to ILSA in 1979. *See* Final Order, pp. 8:26-28 and 9:1-6. Plaintiffs complain that such consideration of legislative history is a reversal of the Arbitrator's April 2010 Order; the reality is Congress' purpose in enacting Section 1703(d) was not relevant to his findings in the April 2010 Order because he merely considered whether the Agreements satisfied the technical requirements of Section 1703(d) and did not need to identify its "reasonable objectives."

Plaintiffs' reliance on *LVCVA* to support the assertion that "[i]t is black letter law that substantial compliance does not excuse the failure to comply with the plain requirements of a statute" is misplaced. *See* Plaintiffs' Motion, p. 26:14-15. The court actually held that "substantial compliance in *this* instance requires the proponents to have at least attempted to satisfy each element in the statute." *LVCVA*, 191 P.2d at 1149 (emphasis added). Far from foreclosing substantial compliance where a party failed to comply with some elements of a

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   statute, the court merely held that the parties in that case could not claim substantial compliance

2   where they had not attempted to satisfy the applicable requirements.  This holding, in part, was

3   based on the court's review of the legislative history of the relevant statute and the finding that

4   the reasonable purposes of the statute were not met by the attempted compliance.

**2.      ILSA Can Be Satisfied Through Substantial Compliance**

**a.      ILSA is Subject to Equitable Defenses Such as Substantial Compliance**

Throughout the proceedings, Plaintiffs contended that ILSA is a strict-liability statute and not subject to equitable defenses.  *See, e.g.*, Plaintiffs' March 2009 Motion, pp. 6-8; Plaintiffs' February 2010 Motion, pp. 56-59.  The Arbitrator acknowledged that "there are some published opinions referring to ILSA as a strict liability statute or [that] require strict compliance," but correctly observed that those cases were decided in the context of a developer seeking to qualify for an exemption.  Final Order, pp. 19:24-28 and 20:1-2.

The only published opinion in which a court considered whether ILSA was subject to equitable defenses, like substantial compliance, was the opinion issued in *Meitis v. Park Square Enters., Inc.*, 2009 WL 3367335 (M.D. Fla. Oct. 15, 2009), which permitted a developer to assert equitable defenses against a claimed violation of ILSA.  Far from being the "outlier" case, *Meitis* was the only case addressing whether ILSA was subject to equitable defenses.  The Arbitrator's reliance on *Meitis* was appropriate at the time of his Final Order and has been justified by the opinion in *Plant v. Merrifield Town Center Ltd. Partnership*, 2010 WL 4674435, at *12 (E.D. Va. Nov. 9, 2010) (considering equitable defenses of laches, estoppel and unclean hands).

In the Plaintiffs' Motion and throughout the proceedings before the Arbitrator, Plaintiffs have cited three cases in which the court rejected the developers' arguments that the developers had substantially complied with Sections 1703(a)(1) and 1703(c).  *See Burns v. Duplin Land Dev., Inc.*, 621 F. Supp. 2d 292 (E.D.N.C. 2009); *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98 (5th Cir. 1978); *Rockefeller v. High Sky, Inc.*, 394 F. Supp. 303 (E.D. Pa. 1975).  However, these cases do not stand for the general proposition that substantial compliance is never applicable to ILSA, rather they are cases in which the developers did not substantially

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

- 26 -

comply with the ILSA provisions at issue.  As mentioned previously, substantial compliance requires "compliance with essential matters necessary to ensure that every reasonable objective of the statute is met." *Williams*, 50 P.3d at 541.  Simply put, the developers in *Burns*, *Law* and *Rockefeller* did not substantially comply with Sections 1703(a)(1)(c) (*Burns*) and 1703(c) (*Law* and *Rockefeller*) because they did not comply with the essential matters necessary to ensure that every reasonable objective of the respective statutes were met.

### b.       Substantial Compliance with Section 1703(d)(2)

Of the dozens of cases provided to the Arbitrator, one case that the Arbitrator found "particularly helpful" because of the similarity of the alleged violations was *Stefan II*.[30]  *See* Final Order, p. 10:1-3.  In *Stefan II*, the buyers complained that the developer had violated Section 1703(d)(2) because the buyers' 20-day cure period commenced when the developer *sent* the notice of default instead of *when* the buyer received the notice as contemplated by the express language of Section 1703(d)(2).  2009 WL 1515529, at *2.  The *Stefan II* court refused to find that the developer violated Section 1703(d)(2) as a matter of law but required the buyer to demonstrate that he was actually harmed by the alleged violation as a condition precedent to entering judgment in his favor.  *Id.*  The court reasoned that "[a]ssuming that Defendants' failure to include the statutory language in the Revised Contract can support a claim for a violation of § 1703(d)(2), whether the violation complained of was substantial and what damages were suffered by Plaintiff as a result of the violation are questions for the trier of fact." *Id.*  In other words, before finding a violation, the court wanted to evaluate if the buyer received—in practice—the rights that were conferred by Section 1703(d)(2).

Plaintiffs make much of Arbitrator's interpretation of the *Stefan* cases and claim that he refused "to follow the actual holdings of the very cases on which he purported to rely, a refusal that is nowhere more evident than in the Arbitrator's discussion of the two opinions in the *Stefan* case."  Plaintiffs' Motion, p. 16:11-13.  Despite Plaintiffs' assertions that the Arbitrator's findings were made with a "heavy emphasis"[31] on the *Stefan* cases, the Arbitrator's findings with

---

[30] Although not mentioned by the Arbitrator or the Plaintiffs, the plaintiff in *Stefan II* and most of the Plaintiffs in this case are similarly situated because they tried to revoke <u>outside</u> the 2-year revocation period.

[31] *See* Plaintiffs' Motion, p. 18:4.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

respect to the application of the Savings Clause made no mention of the *Stefan* cases—indeed the *Stefan* cases provide no law with respect to the enforceability of the Savings Clause for the Arbitrator to disregard.  Similarly, with respect to the finding that Trump substantially complied with ILSA, the Arbitrator makes a single reference to the *Stefan* cases to note that "courts that have reviewed violations of § 1703(d) have not mentioned strict liability nor applied a strict compliance standard." *See* Final Order, p. 20:8-9.

The *Stefan II* court's opinion did, however, raise doubt on Plaintiffs' contention that *any* deviation from the language in Section 1703(d)(2) was an automatic violation of Section 1703(d)(2) without further inquiry (including to consider a savings clause or substantial compliance).  If Plaintiffs' theory was correct that any deviation from the statutory language of Section 1703(d)(2) is a violation, the *Stefan II* court should have found that the developer violated Section 1703(d)(2) and that the only determination that would be left for the court was to determine the remedy whether it was automatic revocation or damages.[32]  Ironically, for those Plaintiffs who are time-barred from exercising the 2-year revocation period (like the plaintiff in the *Stefan* cases*)*, the Arbitrator followed precisely the analysis set forth in *Stefan II* by considering "whether the violation complained of was substantial and what damages were suffered by Plaintiff as a result of the violation...." *Stefan II*, 2009 WL 1515529, at *2.

### 3.   *The Agreement Vests Arbitrator with Equitable Powers*

Not only was the Arbitrator justified by ILSA and the case law interpreting ILSA to consider equitable defenses like substantial compliance, the parties authorized the Arbitrator to consider equity in evaluating the dispute between Trump and the Plaintiffs.  Pursuant to Paragraph 24.10/25.10 of the Agreements, the parties agreed to submit to arbitration any dispute arising from the Agreement.  *See* Agreement at ¶ 24.10/25.10.  Moreover, the parties agreed that such arbitration would be subject to the arbitration rules of the America Arbitration Association. *Id.*  As indicated by the Arbitrator, Rule 43 of the Commercial Arbitration Rules & Mediation Procedures of the America Arbitration Association, specifically empowers the Arbitrator to

---

[32] This was the approach was taken by the court in *Burns* when it found that a violation of Section 1703(a)(1)(C) had occurred without reaching the question of remedy.

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   "grant any remedy or relief that the arbitrator deems just and equitable and within the scope of

2   the agreement of the parties." Final Order, pp. 18:28 and 19:1

3           **4.      *Trump Substantially Complied with the Reasonable Objectives of ILSA***

4           Having correctly determined that ILSA could be satisfied by substantial compliance, the

5   Arbitrator appropriately considered whether Trump had, in fact, substantially complied with

6   ILSA.   To determine whether Trump substantially complied with ILSA, the Arbitrator was

7   obligated to determine if Trump complied "with essential matters necessary to ensure that every

8   reasonable objective of the statute [was] met." *Williams*, 50 P.3d at 541.   The Arbitrator

9   identified the overarching objective of ILSA as follows: "ILSA is an anti-fraud statute that

10  ensures that purchasers are given certain disclosures before they purchase property subject to

11  ILSA." Final Order, p. 20:24-26.   This determination is overwhelmingly supported by courts

12  interpreting ILSA.[33]   In this case, Trump actually complied with the relevant provisions of ILSA

13  by filing a Statement of Record with HUD and providing the required disclosures in the Property

14  Report.

15          With respect to the reasonable objective of Section 1703(d), the Arbitrator found that the

16  objective of "§1703(d)(2) is to ensure the *actual giving of written notice of default and an*

17  *opportunity to cure when a default occurs*." Final Order, p. 21:26-27 (emphasis original).   This

18  finding is supported by the legislative history of Section 1703(d), and no reported authority

19  contradicts this finding.   And Plaintiffs provide none.   In this case, Trump satisfied the

20  reasonable objective of Section 1703(d)(2) by giving Plaintiffs written notice of their defaults

21  and twenty days—at minimum—to cure such defaults. *See* Final Order, pp. 21:27-28 and 22:1.

22          In Plaintiffs' Motion, Plaintiffs argue that the Arbitrator's consideration of harm is

23  evidence of his manifest disregard for the text of Section 1703(d)(2).   As evidenced by the

24  Arbitrator's April 2010 Order, this is true in the context of measuring "actual" compliance with

25  Section 1703(d)(2).   In the April 2010 Order, the Arbitrator did not evaluate whether the

26

27  [33] *See, e.g., Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1447 (11th Cir. 1985) (ILSA "is an antifraud
    statute utilizing disclosure as its primary tool…."); *Cost Control Mktg. & Mgmt, Inc. v. Pierce*, 848 F.2d 47, 48 (3d

28  Cir. 1988) (ILSA "as its title suggests, was enacted to insure that, prior to purchasing certain types of real estate, a
    buyer would be apprised of the information needed to insure an informed decision.").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Plaintiffs were harmed by the limitations.  *See* April 2010 Order.  However, if the reasonable objective of Section 1703(d)(2) is to ensure that buyers are given written notice of defaults and at least 20 days to cure such defaults, then necessarily the Arbitrator would need to inquire into whether such protections were actually given to the Plaintiffs.  No finding of substantial compliance would be complete without such inquiry.

Similarly, if, as claimed by the Plaintiffs, one of the reasonable objectives of Section 1703(d) is to inform buyers of their right to written notice of default and the opportunity to cure such defaults, then Plaintiffs were put on notice of their cure rights through the Property Report. Plaintiffs may not agree with the Arbitrator's findings that Trump substantially complied with Section 1703(d) such that they are not entitled to revoke the Agreements, but the Arbitrator's finding is correct and finds significant support in the relevant legal authorities (including the Agreements) and the facts of this case.

## V.  **CONCLUSION**

For the foregoing reasons, Trump respectfully requests that this Court (1) find that the Arbitrator did not manifestly disregard the law, an (2) uphold the Final Order of the Arbitrator.

DATED:  This 31st day of March, 2011.

SNELL & WILMER L.L.P

PATRICK G. BYRNE, ESQ.
Nevada Bar No. 7636
ALEX L. FUGAZZI, ESQ.
Nevada Bar No. 9022
JUSTIN L. CARLEY, ESQ.
Nevada Bar No. 9994
3883 Howard Hughes Parkway, Ste. 1100
Las Vegas, Nevada 89169

STEVE MORRIS, ESQ.
Nevada Bar No. 1543
300 South Fourth Street, Suite 900
Las Vegas, NV 89101

*Attorneys for Defendant*
*Trump Ruffin Tower I LLC*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

12703372.7